IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TOMIKA MILLER and the ESTATE OF
RAYSHARD BROOKS, by and through
Tomika Miller, Administrator,

     Plaintiffs,

v.

THE CITY OF ATLANTA, GEORGIA;
GARRETT ROLFE, in his individual capacity;
DEVIN BROSNAN, in his individual capacity;

Defendants.

CIVIL ACTION FILE
NO. _____

## **COMPLAINT FOR VIOLATION OF CIVIL RIGHTS**

Tomika Miller brings this lawsuit on behalf of herself, her family and on behalf of the Estate of Rayshard Brooks against the City of Atlanta, Georgia, Officer Devin Brosnan, and Officer Garrett Rolfe, for the senseless and unjustified shooting death of her husband, Rayshard Brooks, who was shot in the back in a Wendy's parking lot on June 12, 2020.

### JURISDICTION

1.    This claim arises under 42 U.S.C. § 1983 and is based upon the Fourth and Fourteenth Amendments to the Constitution of the United States. Plaintiff's claims also arise under Georgia law for  violation of Art. 1

Sec. 1 Par. XIII[1], Art. 1 Sec. 1, Par. XVII[2], breach of ministerial duties, assault and battery. The City of Atlanta is sued solely under 42 USC §1983.

2.  The Court has jurisdiction under U.S.C. § 1343.

## VENUE

3.  The events giving rise to Plaintiffs' claims occurred in the City of Atlanta which is located within the Northern District of Georgia. Defendants are residents of Fulton County, Georgia. Venue is proper in the Northern District of Georgia.

## PARTIES

4.  Tomika Miller is the widow of Rayshard Brooks; she was married to Mr. Brooks at the time of his death. The Estate of Rayshard Brooks is represented herein by Tomika Miller, who is also the mother of the children of Rayshard Brooks, Blessen Miller, Memory Miller-Brooks and Dream Miller. Tomika Miller was appointed as Administrator of Brooks' Estate on December 18, 2020.

---

[1]  This Georgia Constitutional provision establishes that: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated."

[2]  This Georgia Constitutional provision prohibits governmental entities or their employees from abusing "any person" while "being arrested, while under arrest, or in prison"

5.    Defendant City of Atlanta is a body corporate, organized and established as a municipality by operation of the laws of the state of Georgia and is subject to suit.

6.    Garrett Rolfe is an individual who, at all times pertinent to the events giving rise to this lawsuit, was a City of Atlanta Police Officer, and was acting under color of law.  Devin Brosnan is an individual who, at all times pertinent to the events giving rise to this lawsuit, was a City of Atlanta Police Officer and was acting under color of law.  Mr. Rolfe and Mr. Brosnan are each sued in their individual capacity.

**FACTS OF SHOOTING OF RAYSHARD BROOKS**

7.    On the evening of June 12, 2020, Rayshard Brooks was in the driver's seat of a vehicle and was stopped in the drive-thru line at the Wendy's restaurant located at 125 University Avenue, City of Atlanta, Georgia.

8.    While stopped in the drive-thru line, Mr. Brooks briefly fell asleep and was unaware that the vehicles ahead of him in line had pulled forward.

9.    A Wendy's Restaurant employee called 911 and reported that a person [Mr. Brooks] was asleep in his vehicle and stopped in the drive-thru lane.

10.     Atlanta Police Officer Brosnan was not a party to the 911 call and did not hear the content of the call; he was dispatched to investigate the report.

11.     Officer Brosnan arrived at the Wendy's and observed Mr. Brooks asleep in the driver's seat of his vehicle which was stopped and not moving in the drive-thru line.

12.     Officer Brosnan approached the driver's side window of Mr. Brooks' vehicle and woke Mr. Brooks up.

13.     Before approaching Mr. Brooks' vehicle and detaining Mr. Brooks, Officer Brosnan did not personally observe Mr. Brooks driving, operating, or in control of a moving vehicle.

14.     When he was unexpectedly woken up by the police officer, Mr. Brooks was not physically or verbally combative, did not physically resist Officer Brosnan, and did not attempt to flee.

15.     Mr. Brooks calmly answered each of Officer Brosnan's questions without any verbal or physical resistance whatsoever.

16.     At all times during Mr. Brooks' interactions with Officer Brosnan, he was polite, friendly and compliant with all commands given to him.

17.    After initiating the traffic stop and while detaining Mr. Brooks, Officer
       Brosnan directed Mr. Brooks to drive his vehicle from the drive-thru
       line to an open parking space a few feet away.

18.    Mr. Brooks complied with Officer Brosnan's direct command by
       driving his vehicle from the drive-thru lane into the open parking space
       as directed.

19.    Mr. Brooks turned the vehicle's ignition off and again briefly fell
       asleep in the driver's seat while lawfully parked and stopped in a
       parking spot, and was not committing any crime by doing so.

20.    Shortly thereafter, Mr. Brooks opened the driver's door and complied
       with Brosnan's requests to provide his name and date of birth without
       incident.

21.    Mr. Brooks was entirely cooperative with Brosnan.  He did as he was
       asked.  He did not make any statement nor take any action which
       constituted a threat to the officer.

22.    Mr. Brooks was sitting in the driver's seat of his vehicle and speaking
       to Officer Brosnan with the driver's door open when Officer Rolfe
       arrived at the Wendy's parking lot.

23.    Officer Rolfe exited his patrol vehicle and walked to Officer Brosnan while Brosnan was calmly having a conversation with Mr. Brooks without any verbal or physical resistance.

24.    Officer Brosnan briefly left Mr. Brooks alone at his vehicle and walked over to meet Officer Rolfe; Brosnan advised Rolfe that he observed Mr. Brooks asleep in his vehicle which was stopped in the drive-thru line; that he initiated a traffic stop and woke Mr. Brooks up and that Mr. Brooks then complied with Brosnan's commands to pull his vehicle from the drive-thru lane into a marked parking spot.

25.    Rolfe asked Mr. Brooks various questions regarding why he was at the Wendy's, which questions Mr. Brooks calmly and politely answered without any resistance while he remained seated in the driver's seat.

26.    Rolfe asked Brooks to exit the driver's seat but to first take his hat off and leave it in the car; Brooks complied and took his hat off and exited the driver's seat as directed.

27.    Rolfe asked Brooks whether he could pat him down to search him for weapons, in response to which Brooks politely replied, "absolutely," and voluntarily consented to a pat-down search without any resistance whatsoever.

28.    During the pat down search, Rolfe asked Brooks what he had in his pockets and Brooks politely and calmly explained that it was just money which Rolfe thereafter confirmed without incident.

29.    Rolfe asked Brooks to put his phone on the car; Brooks complied without any hesitation or resistance.

30.    Rolfe directed Brooks to complete a series of field sobriety tests, each of which Brooks completed without incident.

31.    Mr. Brooks was polite, articulate, responded to Rolfe's questions, and complied with all commands given to him while completing the field sobriety tests and did not physically resist or attempt to flee.

32.    Brooks completed the field sobriety tests without incident.

33.    As of this point in time, Mr. Brooks was entirely cooperative with Officer Rolfe by answering his questions and submitting to a pat-down search without offering any verbal or physical resistance whatsoever. He did as he was asked.  He did not make any statement which constituted a threat to this officer and he did not take any action which constituted a threat to the Officer Rolfe or Officer Brosnan or any other person.

34.    Officer Rolfe checked Mr. Brooks to determine whether or not he was armed with any weapon or anything potentially harmful.  Rolfe found

nothing which reflected that Brooks was armed or was in possession of anything which posed any risk of harm to the officers or to any other person.

35.    After completing the field sobriety tests, Officer Rolfe directed that Mr. Brooks submit to a "preliminary" breath test for alcohol.

36.    Mr. Brooks was confused about what the test entailed but nevertheless cooperated and complied with Officer Rolfe's commands to submit to the breath test, stating that he "don't want to refuse anything."

37.    Mr. Brooks asked Brosnan and Rolfe if he could simply lock up the car and "just go home" by walking to his sister's house.

38.    The officers did not allow Mr. Brooks to go home, and continued detaining him.

39.    Mr. Brooks remained calm, polite, cordial and cooperative with the officers for over 41 minutes during the traffic stop without offering any physical resistance or attempting to flee, answered all questions asked of him, and complied with every instruction given to him.

40.    While completing the field sobriety tests, Mr. Brooks asked appropriate questions to clarify Rolfe's directions to him, and provided prompt, clear responses when questioned.

41.    Rolfe administered a breath test on Mr. Brooks without obtaining his informed consent.

42.     Seconds after completing the breath test, Officer Rolfe began

handcuffing Mr. Brooks to arrest him and take him into custody

without informing him that he was being charged with DUI or any

other crime.

43.     The policies of the City of Atlanta Police Department required that

Brooks be informed that he was being charged.

44.     As the Georgia Supreme Court recently made perfectly clear, a citizen

such as Mr. Brooks has the right to take reasonable steps to resist an

unlawful arrest.

45.      As Officer Rolfe began to handcuff Mr. Brooks, he was thrown to the

ground by the officers.

46.      Officer Brosnan was in possession of a Taser weapon which had been

issued to him by the City of Atlanta Police Department. He drew the

Taser and threatened Mr. Brooks with it while Brooks was on the

ground.

47.     Pursuant to the City of Atlanta Police Department's written policy in

effect at the time of Mr. Brooks' death,  "[o]nly officers who have

completed the Training Section's approved certification course of

instruction on the carry, use, and maintenance of the CEW shall be

authorized to carry and use the device."

48.   At all times material herein, Officer Brosnan had not completed the Department's mandatory Taser certification course and was not authorized to handle, carry, use, or maintain any Taser weapon.

49.   The City of Atlanta issued a Taser weapon to Officer Brosnan despite his failure to complete mandatory Taser certification and training.

50.   Mr. Brooks stood up while being threatened by Brosnan's Taser. Brooks  gained control of the Taser weapon Officer Brosnan was carrying.

51.   Officer Rolfe then retrieved his own Taser weapon with his right hand and shot it at Mr. Brooks, hitting him with the Taser darts, stunning Mr. Brooks.

52.   The Taser used by Rolfe was the same type as that used by Mr. Brosnan.   Once the darts or 'prongs' of the Taser are fired, the Taser is no longer capable of immobilizing the targeted person.  This second stage of the Taser can be used in 'drive stun' mode but is no longer a threat of serious bodily harm to anyone.

53.   After being struck and stunned by Rolfe's taser, Mr. Brooks turned his back to the two officers and began running away.   While running away from the officers, Brooks did not verbally threaten either officer or any other person.

54.    Officer Rolfe chased Mr. Brooks on foot while holding his Taser weapon in his right hand.

55.    While Mr. Brooks was running away with his back to Officer Rolfe, Rolfe moved his Taser weapon from his right hand to his left and retrieved his handgun from its holster using his right hand.

56.    While Mr. Brooks was running away with his back to Officer Rolfe, Brooks ejected the prongs from Brosnan's Taser aimlessly into the air. The prongs did not strike any person and did not pose an immediate threat of serious bodily harm or death to Rolfe, Brosnan, or any other person.   Once the prongs were discharged from the Taser carried by Brooks, Brooks's continued possession of the Taser did not constitute a threat of physical harm to either the officers or to any other person.

57.    As Brooks was running away with his back to the two officers, he made no threat to any person.  As he ran, he did not pose an objective threat of bodily harm to any other person.  As he ran, all that he wanted to do was get home.

58.    As Brooks was running away with his back to the two officers and not posing an immediate threat of serious bodily harm or death to any person, and without any warning whatsoever, Rolfe raised his firearm and fired three shots aimed at Mr. Brooks' back.

59.   Two of Rolfe's bullets struck Mr. Brooks in the back and caused him to immediately fall helpless to the ground; the third bullet struck a nearby occupied vehicle.

60.   Mr. Brooks was still alive when he fell to the ground.

61.   Officers Rolfe and Brosnan went to Mr. Brooks and stood over him while he was laying on the ground; each of them  observed that Brooks was still alive, bleeding and writhing in pain from his gunshot wounds. Each observed that Brooks was entirely helpless and posed absolutely no risk of flight or risk of harm to anyone.

62.   Both officers had knowledge that Mr. Brooks had sustained deadly gunshot wounds which required immediate medical assistance.

63.   For several minutes while standing over and/or alongside Mr. Brooks on the ground, neither officer made any effort to provide Mr. Brooks with any medical assistance.  The policies and procedures of the City of Atlanta's Police Department require that medical aid be provided by the officers as soon as practicable.  Each officer failed to comply with this policy.

64.   While Mr. Books was on the ground, rather than provide medical assistance for his deadly gunshot wounds, Officer Brosnan placed his foot on top of Brooks' shoulder.

65.   While Mr. Books was on the ground, rather than provide medical assistance for his deadly gunshot wounds, Officer Rolfe forcefully kicked Mr. Brooks.

66.   Mr. Brooks was not provided any medical attention or assistance for his deadly gunshot wounds until an ambulance arrived at the scene, at which point he was transported to a hospital where he died following surgery.

67.   Defendant Rolfe's conduct showed willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care which would cause the presumption of conscious indifference to consequence.  Defendant Rolfe acted with intent to injure Mr. Brooks.

68.   Because of the intentional and malicious nature of Defendant Rolfe's conduct, he is not entitled to official immunity from the state law based claims presented herein and is further liable to the Estate of Rayshard Brooks for punitive damages.

## CAUSES OF ACTION

## COUNT ONE

## FOURTH AMENDMENT AND STATE LAW– ROLFE'S

## EXCESSIVE DEADLY FORCE

69.   When Officer Rolfe shot and killed Mr. Brooks, Mr. Brooks did not pose an immediate threat of serious physical harm or death to other persons and, as a result, Rolfe's use of deadly force was unjustified and constituted a violation of the Fourth Amendment of the United States Constitution.

70.   Based on the totality of facts and circumstances described herein, no reasonable officer could have believed that Mr. Brooks posed any immediate threat of serious physical harm or death to any person while he was running away with his back to the officers.

71.   Every reasonable officer would have known that the force used by Rolfe was unreasonably disproportionate and excessive and would violate Mr. Brooks' Fourth Amendment rights.

72.   Rolfe violated clearly established law and is not entitled to qualified immunity for his use of deadly force in shooting Mr. Brooks.  Rolfe's use of force against Mr. Brooks after Mr. Brooks was wounded and lying on the ground constituted an assault and battery upon Mr. Brooks.

73.   By virtue of the facts described herein, the actions of Officer Rolfe constitute assault and battery under Georgia law; a violation of Article I, Paragraph XIII of the Constitution of the State of Georgia; and abuse

in being arrested in violation of Article I, Paragraph XVII of the Constitution of the State of Georgia.

74. Rolfe acted with actual malice and an intent to injure Mr. Brooks by using deadly and excessive force such that he is not entitled to official immunity under state law.

75. As a result of Rolfe's unlawful conduct, Plaintiff sustained injuries and pain in advance of his death, and sustained injuries which caused Mr. Brooks' death.

## COUNT TWO

## DENIAL OF MEDICAL CARE CLAIM AGAINST ROLFE AND BROSNAN

76. After Mr. Brooks was shot twice in the back, he immediately fell to the ground.

77. Mr. Brooks was still alive but was physically helpless while bleeding from his gunshot wounds on the ground, at which point Mr. Brooks was in the full control of Brosnan and Rolfe, posed absolutely no risk of harm to anyone, and was physically incapable of resisting arrest.

78. While Mr. Brooks was bleeding on the ground, he was not resisting arrest, was not attempting to flee, and was not posing any threat of harm to the officers or any other person.

79.  While Mr. Brooks was bleeding on the ground, Rolfe and Brosnan had knowledge that Brooks sustained two gunshot wounds directly into his back, and had knowledge that Mr. Brooks' gunshot wounds were serious and required immediate medical attention.

80.  Rather than render medical aid to Mr. Brooks or make any effort to do so, Officer Brosnan placed his foot on Mr. Brooks' shoulder ; Officer Rolfe forcefully kicked Mr. Brooks, at which point Mr. Brooks was still alive but in need of immediate medical attention and physically helpless.

81.  Brosnan and Rolfe's conscious decision to physically assault Mr. Brooks rather than render medical aid to his serious gunshot wounds constitutes deliberate indifference to Mr. Brooks' serious medical needs in violation of the Fourteenth Amendment.

82.  Every reasonable officer with knowledge that Brooks had sustained two serious and potentially deadly gunshot wounds to his back would have known that standing on Brooks' shoulder and kicking him while he was still alive and bleeding on the ground, rather than render immediate medical aid, would violate Mr. Brooks' Fourteenth Amendment rights to medical treatment.

83.  Brosnan and Rolfe are not entitled to qualified immunity for their failure to render medical aid to Mr. Brooks in violation of the Fourteenth Amendment and are liable for the damages resulting from the same.

84.  The policies and procedures of the City of Atlanta Police Department which direct that medical aid be rendered by its officers constitutes a ministerial duty.  Defendants Rolfe and Brosnan each breached that ministerial duty through their negligent or intentional conduct and, as result, are subject to liability to the Estate of Mr. Brooks for the pain caused him during his last remaining moments of life.

## COUNT THREE

### CUSTOMS AND PRACTICES OF CITY OF ATLANTA POLICE DEPARTMENT CAUSED THE DEATH OF RAYSHARD BROOKS

85.  The City of Atlanta Police Department has a custom and practice of accepting false versions of police officers concerning the officers' use of physical force.  The effect of this practice resulted in the death of Rayshard Brooks.

86.  The City of Atlanta, by and through the recurrent practices of its police officers, including those charged with the investigation of civilian

complaints of police abuse, has a custom and practice on the part of its offices as follows:

a. an officer commits an act of violence or an act of other breach of the constitutional rights of a civilian;

b. said officer falsely reports that they did not engage in the act of violence nor any other act constituting a breach of the constitutional rights of a civilian;

c. both the officer, along with and those officers designated to supervise that officer or to investigate the conduct of the officer, accept the officer's false statement concerning their conduct towards the civilian and either refuse or fail to even report the physical misconduct or, if they report that an incident occurred, they adopt the officer's false version of events despite immediately available evidence contradicting the officer's false version.

87.  By way of example only, APD failed to conduct meaningful investigations of the following complaints wherein multiple officers were alleged to use gratuitous, excessive force without justification:

a.  On May 7, 2003, an uninterested bystander observed Defendant Gardner strike a handcuffed arrestee (David Childs) in the face with his knee and/or his gun while the arrestee was seated inside the Zone 3 precinct where surveillance videos were installed (the "Childs incident"), and informed APD of the same; despite the bystander's willingness to submit to a lie detector test to confirm his

veracity, APD did not perform a lie detector test, and did not review the available surveillance video footage which would have confirmed or denied the allegation against Gardner; APD had knowledge that the head wounds Childs sustained during his arrest suddenly re-opened and began bleeding again while he was handcuffed at the precinct, but did not make any inquiry as to how the arrestee was re-injured at the precinct. APD opened and closed its investigation without confirming or denying whether the allegation that Gardner used excessive force at the precinct was true.

b. On July 1, 2006, an arrestee (Raymond Clay) informed APD that Defendant Mark Gardner struck him in the head with a two-way radio and kicked him while he was not resisting. APD opened and closed its investigation without confirming or denying whether the allegation that Gardner used excessive force was true.

c. On November 10, 2006, Jermichael Lockette informed APD that 2 APD officers - Defendant Streeter and/or Val Lester - used excessive force by suddenly punching him in the face and ripping out four dreadlocks from his head during an investigatory stop (the "Lockette incident").

    1. Although both officers denied striking Lockette and claimed that they were unaware how he had sustained his confirmed injuries, APD administered a Computer Voice Stress Analysis ("CVSA") to both officers on March 16, 2007 which indicated deception when the officers denied using force against Lockette.

    2. Based on the officers' deception, on or about May 21, 2007, APD concluded that the allegations of excessive force were SUSTAINED and issued oral reprimands to both officers.

    3. On November 4, 2008, APD administered a CVSA to Lockette, which confirmed that no deception was indicated with regard to his allegations regarding the officers' use of force.

    4. On December 24, 2008, APD prepared a new Investigation Disposition Form for the Lockette

incident which, without explanation, now concluded that Streeter and Lester used reasonable force and recommended that the allegation that the officers punched Lockette in the face and pulled his dreadlocks out from his head be rescinded and changed to "NOT SUSTAINED."

5. Without offering any explanation, on or about June 15, 2009, APD adopted the recommendation and formally rescinded its prior finding that Streeter and Lester used excessive force by punching Lockette in the face and pulling his dreadlocks out from his head, and changed the disposition in both officers' disciplinary files to "NOT SUSTAINED."

6. At no point was either officer investigated, reprimanded, or disciplined for failing to intervene in the other officer's sustained use of excessive force in connection with the Lockette incident.

d. Karla Weems informed APD that on June 28, 2011, 4 APD officers from the Fugitive Unit broke through the front door of her home, handcuffed all occupants, and searched her home without a warrant. One of the handcuffed occupants, Mike Gibbs, informed APD that an officer dragged him outside and threw him to the ground, face-first, after he was handcuffed and not resisting. Another occupant, Rontavious Loyal, informed APD that another officer kicked him and threw him to the ground outside. The officers released all occupants after determining that the subject of their search was not present. APD did not subject any of the officers who were present to CVSDs and instead closed its investigation without confirming or denying whether the allegation of excessive force was true.

e. Ezoeke Parks informed APD that on August 23, 2011, 2 APD Officers - Jose Vidal and Norattam Holden - beat her and her daughter, informing APD that: (i) Officer Vidal kicked her in her stomach, dragged and pulled her by her hair, and kneed her in her back during her arrest; and (ii) that Officer Holden grabbed her 14-year old daughter by her neck and kneed her in her stomach. The ACRB concluded that there was sufficient evidence to sustain the citizen's

allegations of excessive force against both officers and recommended to APD that the officers be suspended and undergo psychological evaluation. APD rejected the ACRB's recommendation, and instead concluded that there was insufficient evidence to sustain the allegations of excessive force against either officers without subjecting anyone to a CVSD. More specifically, APD explicitly concluded that pulling the citizen's hair was a reasonable "method to ensure that she was handcuffed." APD did not investigate or discipline either officer for failing to intervene in the other's use of excessive force.

f. Bailey Cato informed APD that on September 14, 2014, 2 APD officers - Michael Soprano and Matthew Johns - pepper-sprayed him and repeatedly punched him in the face and beat him without provocation. APD and the Chief rejected the ACRB's finding that the allegation that these 2 APD officers used excessive force and rejected ACRB's recommendation that the officers be suspended and receive additional training, and did not impose any discipline on the officers for their use of excessive force. Moreover, APD did not investigate or discipline either officer for failing to intervene in the other's use of excessive force.

g. Richard Williams informed APD that on March 31, 2015, after several APD officers in the Fugitive Unit stormed into his motel room to arrest him, an unidentified APD officer struck him in the head with a silver revolver while he was not resisting arrest. Despite confirming that the arrestee sustained a gaping two-inch headwound during his arrest which required treatment at the hospital, none of the __ officers present during the arrest could explain how Williams sustained said injury and provided conflicting accounts of the events that occurred during the arrest. APD did not subject any officers to CVSDs and instead closed its investigation without confirming or denying whether the allegation of excessive force was true.

88.    As another example, on the evening of August 25, 2012, Dr. Jay

Berger was arrested by Officer Lawrence of the City of Atlanta Police;

Mr. Berger filed a complaint with the City alleging that the officer

struck his knee with such force that it tore his ACL and caused other bodily harm during his arrest, ultimately requiring hospitalization and surgery; the City blindly accepted the officer's unsupported denials of wrongdoing and denial of knowledge of any force being used on Berger's knee, despite the absence of any explanation as to how Berger sustained a documented serious knee injury during arrest; the City continued to accept the officer's denial of the use of any force upon Berger even after a civil trial in federal court resulted in a verdict in favor of Berger finding that Lawrence had used excessive force against Berger.

89. Another example of the City's unconstitutional practice and custom is the following:  In March of 2010, Randal Brooks was arrested and tackled to the ground by Officers Alexander and Murden of the City of Atlanta Police Department.

90. Before being tackled he was uninjured and fully able to walk.  Once taken to the ground, Brooks was on his stomach and the two officers forced their knees into his spine and neck area.

91. During his arrest, Brooks' spine was fractured and he was paralyzed as a result of physical force applied directly to his spine.

92.    The nature of his spinal injury was documented to be consistent with a knee having been positioned onto his spine, accompanied with a significant amount of force applied to his spine. There is no other available explanation for just how Mr. Brooks' spine was fractured. Brooks remained paralyzed from the neck down throughout the remainder of his life; he died in 2012.

93.    Each of the officers at the scene of Brooks' arrest claimed that they did not apply, nor did they see any other officer apply, any force to Brooks' cervical spine.   Despite the catastrophic nature of the injury, the officers repeated their claims to superior officers who merely accepted their story.  The City of Atlanta continued to accept the officers' denial of the use of force upon Brooks both before and after settlement of Brooks' Estate's claim.

94.    Another example of this custom and practice involves Robert Doe. [The last name is withheld because the victim of the officer's force was a minor at the time.]  In December of 2019, Robert Doe's legs were shattered by the reckless use of force by Atlanta Police Officer Erik Clanton.

95.   Robert was alleged to be selling water bottles to passing motorists when he was approached by Clanton and another officer in mid-town Atlanta.

96.   Fearful of police officers, Robert ran away.  Robert reached and scaled a fence.  As Robert reached the other side of the fence, below which was a 20-30 foot drop to a highway, Clanton forcefully ran into the fence – twice – causing Robert to lose his grip on the fence and causing him to fall.  The fall shattered his legs and caused a broken shoulder and facial fractures.

97.   Officer Clanton falsely reported that, rather than causing Robert's fall, he had "attempted to reach for" Robert to pull him down from the fence.

98.   Despite the availability of graphic video evidence contrary to Clanton's report, The City of Atlanta accepted Clanton's denial of use of force on Robert.

99.   Other examples of this practice will be revealed following the utilization of discovery through the Federal Code of Civil Procedure.

100.  There are at least two occasions where Officer Rolfe engaged in excessive force resulting from or consistent with the afore-mentioned custom and practice.

101. In 2015 Rolfe shot Jackie Harris after the vehicle being operated by Harris was incapacitated and Harris no longer posed an imminent threat of harm to any other person.  The initial police report of Harris' arrest made no reference to any officer firing a gun.  This under-reporting of the use of force is consistent with the custom and practice of Officers of the City of Atlanta.

102. In May of 2020 Rolfe used excessive force against Charles Johnson, Jr., when – despite the absence of justification – Rolfe threw Charles Johnson, Jr. to the ground during a traffic stop breaking Johnson's collar bone and resulting in the need for substantial medical services.

103. The City's widespread and persistent pattern and practice of failing to conduct meaningful investigations into numerous serious allegations of excessive force, and the lack of officer accountability directly associated therewith, was so widespread and persistent that it amounts to a municipal policy of deliberate indifference and was the moving force behind Defendants' use of excessive force against Plaintiffs.

104. As a direct and proximate result of the existence of the custom and practice as is described above, officers of the City of Atlanta learn that false reporting, including the lack of reporting, of their use of violence upon civilians will be tolerated.

105.  As a direct and proximate result of the city's custom and practice, officers follow said custom and practice and engage, as did Officer Rolfe, in the use of excessive force, possibly falsely report it, and then anticipate that they will incur no adverse repercussions from the use of violence against civilians.

106.  As a direct and proximate result of the City's custom and practices described above, Mr. Brooks was subjected to excessive deadly force and died.

**COUNT FOUR**

**CITY OF ATLANTA FAILED TO TRAIN OFFICERS IN DE-ESCILLATION RESULTING IN BROOKS DEATH**

107.  The Fourth Amendment of the United States Constitution prohibits the use of deadly force to seize a fleeing suspect if that suspect does not – at the time of the use of such deadly force – constitute an immediate threat of physical harm to other persons.

108.  Even if it were the case, which Plaintiffs contest, that there was ever a moment at which Officer Rolfe could have been constitutionally justified in the use of deadly force against Mr. Brooks – such a moment did not exist at the time that Rolfe shot and killed Mr. Brooks.

109.  The City of Atlanta failed to train its officers that they may not use deadly force to against a fleeing suspect when the circumstances which could have arguably justified such deadly force have later passed and no longer exist.  Such failure to train resulted in the shooting death of Mr. Brooks and caused a violation of the Fourth Amendment for which the City of Atlanta is liable both to the Estate of Mr. Brooks and to his family for his wrongful death.

## **PRAYER FOR RELIEF**

For and upon the foregoing, Plaintiffs pray that the Court grant the following relief:

a.  That the Estate of Rayshard Brooks be awarded compensatory damages from the Defendants for the pain and suffering of Rayshard Brooks prior to his death and be awarded all special damages permitted by operation of federal and Georgia law;

b.  That Tomika Miller be awarded judgment against Garrett Rolfe and the City of Atlanta for all damages permitted by law for the wrongful death of Mr. Rayshard Brooks, as measured by the full value of Mr. Rayshard's life;

c.  That the Estate of Rayshard Brooks be awarded punitive damages from Garrett Rolfe in an amount set by the enlightened conscience of the jury;

d.  That a trial by jury be had upon all issues so triable; and,

e.     That the Plaintiffs be awarded such other and further relief to this Court

is deemed just and proper.

So submitted on this the 10th day of September, 2021.

> s/ L. CHRIS STEWART
> Bar No. 142289
> Dianna J. Lee
> Bar No. 163391
> Stewart Miller Simmons Trial Attorneys
> 55 Ivan Allen Jr Blvd Suite 700
> Atlanta, GA 30308
> 844-874-2500
> cstewart@smstrial.com
> dlee@smstrial.com
>
> s/ G. BRIAN SPEARS
> Bar No. 670112
> Jeff Filipovits
> Bar No. 825553
> Spears & Filipovits, LLC
> 1126 Ponce de Leon Ave.
> Atlanta, GA 30306
> 404-872-7086
> bspears@civil-rights.law
> jeff@civil-rights.law