## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **TOMIKA MILLER and the ESTATE OF RAYSHARD BROOKS, by and through Tomika Miller, Administrator,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **CIVIL ACTION NO. 1:21-cv-03752-SDG** |
| **THE CITY OF ATLANTA, GEORGIA; GARRETT ROLFE, in his individual capacity; DEVIN BROSNAN, in his individual capacity,** | ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## FIRST AMENDED COMPLAINT

Tomika Miller brings this lawsuit and first amended complaint on behalf of herself, her family and on behalf of the Estate of Rayshard Brooks against the City of Atlanta, Georgia, Officer Devin Brosnan, and Officer Garrett Rolfe, for the senseless and unjustified shooting death of her husband, Rayshard Brooks, who was shot in the back in a Wendy's parking lot on June 12, 2020.[1]

---

[1] This amendment is made pursuant to Fed. R. Civ. P. 15(a)(1)(B). Defendant City of Atlanta filed a motion to dismiss under Rule 12(b)(6) on October 22, 2021. *See* Doc. 14.

## JURISDICTION

1.      This claim arises under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments to the Constitution of the United States and for violations of Georgia law.

2.      The Court has subject matter jurisdiction jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

## VENUE

3.      The events giving rise to Plaintiffs' claims occurred in the City of Atlanta which is located within the Northern District of Georgia.  Defendants are residents of Fulton County, Georgia. Venue is  proper in the Northern District of Georgia.

## PARTIES

4.      Tomika Miller is the widow of Rayshard Brooks; she was married to Mr. Brooks at the time of his death.  The Estate of Rayshard Brooks is represented by Tomika Miller, who is also the mother of the children of Rayshard Brooks, Blessen Miller, Memory Miller-Brooks and Dream Miller.  Tomika Miller was appointed as Administrator of Brooks' Estate on December 18, 2020.

5.    Defendant City of Atlanta is a body corporate, organized and established as a municipality by operation of the laws of the state of Georgia and is subject to suit.

6.    Garrett Rolfe is an individual who, at all times pertinent to the events giving rise to this lawsuit, was a City of Atlanta Police Officer, and was acting under color of law.

7.    Devin Brosnan is an individual who, at all times pertinent to the events giving rise to this lawsuit, was a City of Atlanta Police Officer and was acting under color of law.

8.    Mr. Rolfe and Mr. Brosnan are each sued in their individual capacity.

## THE DEATH OF RAYSHARD BROOKS

9.    On the evening of June 12, 2020, Rayshard Brooks was in the driver's seat of a vehicle and was stopped in the drive-thru line at the Wendy's restaurant located at 125 University Avenue, City of Atlanta, Georgia.

10.    While stopped in the drive-thru line, Mr. Brooks briefly fell asleep and was unaware that the vehicles ahead of him in line had pulled forward.

11.    A Wendy's Restaurant employee called 911 and reported that a person, Mr. Brooks, was asleep in his vehicle and stopped in the drive-thru lane.

12.    Officer Brosnan was dispatched to investigate the report.

13.     Officer Brosnan arrived at the Wendy's and observed Mr. Brooks asleep in the driver's seat of his vehicle which was stopped and not moving in the drive-thru line.

14.     Officer Brosnan approached the driver's side window of Mr. Brooks' vehicle and woke Mr. Brooks

15.     After Brosnan awakened him, Brooks calmly answered each of Officer Brosnan's questions.

16.     While detaining Mr. Brooks, Officer Brosnan directed Mr. Brooks to drive his vehicle from the drive-thru line to an open parking space a few feet away.

17.     Mr. Brooks complied with Officer Brosnan's direct command by driving his vehicle from the drive-thru lane into the open parking space as directed.

18.     Mr. Brooks opened the driver's door and complied with Brosnan's request for his  name and date of birth.

19.     Mr. Brooks was sitting in the driver's seat of his vehicle and speaking to Officer Brosnan with the driver's door open when Officer Rolfe arrived at the Wendy's parking lot.

20.     Officer Rolfe exited his patrol vehicle and walked toward Officer Brosnan and Brooks.

21. Officer Brosnan briefly left Mr. Brooks alone at his vehicle and walked over to meet Officer Rolfe; Brosnan advised Rolfe that he observed Mr. Brooks asleep in his vehicle which was stopped in the drive-thru line; that he initiated a traffic stop and woke Mr. Brooks up and that Mr. Brooks then complied with Brosnan's commands to pull his vehicle from the drive-thru lane into a marked parking spot.

22. Rolfe then asked Mr. Brooks various questions regarding why he was at the Wendy's; Mr. Brooks answered his questions.

23. Rolfe asked Brooks to exit the driver's seat but to first take his hat off and leave it in the car; Brooks complied and took his hat off and exited the driver's seat as directed.

24. Rolfe asked Brooks whether he could pat him down to search him for weapons, in response to which Brooks politely replied, "absolutely," and voluntarily consented to a pat-down search.

25. During the pat down search, Rolfe asked Brooks what he had in his pockets and Brooks explained that it was money which Rolfe thereafter confirmed.

26. Rolfe determined that Brooks did not have any weapons in his possession after the pat down search.

27. Rolfe asked Brooks to put his cell phone on the car; Brooks complied.

28.     Rolfe directed Brooks to complete a series of field sobriety tests, each of which Brooks completed without incident.

29.     During the investigation and before arrest, Mr. Brooks was polite and responded to Rolfe's questions, and complied with all commands given to him while completing the field sobriety tests and did not physically resist or attempt to flee. He did as he was asked.  He did not make any statement which constituted a threat to this officer and he did not take any action which constituted a threat to the Officer Rolfe or Officer Brosnan or any other person.

30.     After completing the field sobriety tests, Officer Rolfe directed that Mr. Brooks submit to a preliminary breath test for alcohol.

31.     Mr. Brooks was confused about what the test entailed but nevertheless cooperated and complied with Officer Rolfe's commands to submit to the breath test.

32.     Mr. Brooks asked Brosnan and Rolfe if he could simply lock up the car and "just go home" by walking to his sister's house.

33.     Soon after completing the breath test, Officer Rolfe began to place handcuffs on Mr. Brooks to arrest him.

34.     Brooks appeared surprised, and did not understand why he was being handcuffed.

35.     Officer Rolfe did not explain that Brooks was being arrested.

36.      As Officer Rolfe began to handcuff Mr. Brooks, Brooks pulled away from the Officers.

37.     The Officers then took Brooks to the ground, where they were both positioned on top of Brooks.

38.     After being taken to the ground, Brooks did not immediately resist the Officers. As he was on the ground with the Officers positioned over him, Brooks repeatedly said "Mr. Rolfe, Mr. Rolfe," in an attempt to deescalate the situation.

39.     Officer Brosnan was in possession of a taser weapon which had been issued to him by the City of Atlanta Police Department. He drew the taser and threatened Mr. Brooks with it while Brooks was on the ground.

40.     Brosnan discharged his taser in drive stun mode onto Brooks' leg. Brosnan's use of the taser caused Brooks to grab Brosnan's taser to stop its continued use.

41.     Officer Brosnan was not authorized to carry the taser he used against Brooks. Pursuant to the City of Atlanta Police Department's written policy in effect at the time of Mr. Brooks' death, "[o]nly officers who have completed the Training Section's approved certification course of instruction on the carry, use, and maintenance of the CEW shall be authorized to carry and use the device."

42.     At all times material herein, Officer Brosnan had not completed the Department's mandatory taser certification course and was not authorized to handle, carry, use, or maintain any taser weapon.

43.     After Brooks grabbed Brosnan's taser to prevent Brosnan from continuing to use it to shock Brooks, a struggle ensued.

44.     During the entire struggle with the Officers, Brooks did not punch or kick the Officers.

45.     During the struggle with the Officers, Brooks gained control of Brosnan's taser.

46.     During the struggle, the taser discharged once but did not strike any officer.

47.     Officer Rolfe knew that Brosnan's taser had been discharged.

48.     Brooks then began running away from the Officers.

49.     Officer Rolfe then retrieved his own taser with his right hand and shot it at Mr. Brooks twice as Brooks ran away. Those taser shots were ineffective, and Brooks continued to run from the Officers.

50.     Officer Rolfe chased Mr. Brooks on foot while holding his taser in his right hand.

51.     As Brooks ran, he out paced Rolfe and was increasing the distance between himself and the Officers.

52.     As Brooks ran, Officer Rolfe began to unholster his firearm while running after Brooks.

53.     As Brooks was running away with his back to the two officers, he did not threaten or run toward any other person.

54.     Both officers knew that Brooks had been peaceful and compliant until the moment of his unexpected arrest.

55.     Neither officer had any basis to believe that Brooks intended to harm any other person as he ran from the Officers.

56.     As Brooks continued to run away from Rolfe, Brooks turned and discharged the taser he was carrying.

57.     At the time Brooks discharged the taser, Rolfe was outside the range of the taser.

58.     Based on his training, Officer Rolfe knew at the time Brooks discharged the taser that he was outside the effective range of the weapon. He knew that the prongs of a taser can only extend a limited distance—and that he was beyond that distance.

59.     The prongs from the taser did not come close to striking either officer or any other person, and Brooks continued to run away from the Officers.

60.     After Brooks discharged the taser, and as he continued to run away from the Officers, Rolfe raised his firearm and fired three shots aimed at Mr. Brooks' back.

61.     When Rolfe fired his gun at Brooks, Rolfe was the closest person to Brooks.

62.     When Rolfe shot Brooks, Brooks was rapidly increasing the distance between himself and Rolfe and there was nearly twenty feet of distance between the two.

63.     When Rolfe shot Brooks, Brooks' back was turned completely and Brooks was running away from Rolfe.

64.     When Rolfe shot Brooks, Brooks was not running toward any other person.

65.     When Rolfe shot Brooks, Rolfe knew, based on his training and experience, that because the taser Brooks was carrying had been discharged twice, it could only be used in "drive stun" mode.

66.     Rolfe knew, based on his training and experience, that when a taser can only be used in "drive stun mode," the prongs are discharged and no longer

available; instead, in drive stun mode the taser is pressed directly against a person's skin. That mode can be used to cause pain, but it generally does not incapacitate a person as the prong mode is designed to do.

67.     Rolfe knew that a taser used in "drive stun mode" does not cause serious physical injury.

68.     Rolfe knew that the taser possessed by Brooks could only be used in drive stun mode because it had already been discharged twice.

69.     Rolfe did not provide any warning prior to firing his gun.

70.     Rolfe shot three bullets at Brooks, in spite of knowing that the weapon held by Brooks could not be used to cause serious physical injury, and in spite of Brooks running away from the Officers and not posing a danger to any other person.

71.     Two of Rolfe's bullets struck Mr. Brooks in the back and caused him to immediately collapse to the ground; the third bullet struck a vehicle parked in the parking lot that was occupied by passengers.

72.     Mr. Brooks was helpless, but still alive, after he fell to the ground.

73.     Officers Rolfe and Brosnan went to Mr. Brooks and stood over him while he was laying on the ground.

74.     Both officers observed that Brooks was still alive, bleeding and writhing in pain from his gunshot wounds – wounds which required immediate medical attention.

75.     Both officers observed that Brooks was entirely helpless and posed absolutely no risk of flight or risk of harm to anyone.

76.     Both officers knew that Mr. Brooks sustained gunshot wounds to his upper torso that required immediate medical attention.

77.     For several minutes while standing over Mr. Brooks, neither officer made any effort to provide Mr. Brooks with any medical assistance.

78.     While Mr. Books was on the ground, rather than provide medical assistance for his deadly gunshot wounds, Officer Brosnan placed his foot on top of Brooks' shoulder causing Brooks additional pain.

79.     While Mr. Brooks was on the ground, rather than provide medical assistance for his deadly gunshot wounds, Officer Rolfe forcefully kicked Mr. Brooks.

80.     Rolfe and Brosnan made no effort to provide Brooks with any medical attention.

81.     An ambulance arrived at the scene and transported Mr. Brooks to a hospital where he died following surgery.

82.     Defendant Rolfe's conduct showed willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care which constitutes deliberate indifference.

## CITY OF ATLANTA POLICY AND TRAINING RELATED TO THE USE OF DEADLY FORCE

83.     Officer Rolfe was trained by the City of Atlanta that deadly force was authorized in response to any "violent, unlawful, aggressive resistance to a lawful arrest."

84.     Officer Rolfe maintains that his actions in shooting and killing Rayshard Brooks were authorized by City policy and the training he received during his employment with the City of Atlanta because, at some point prior to the shooting, Mr. Brooks resisted arrest and then fled from officers.

85.     Pursuant to its official policy, the City trains its officers that deadly force is authorized against any fleeing suspect who at some point earlier may have inflicted or threatened serious if the suspect poses a "continuing danger" of serious harm if allowed to escape, regardless of the immediacy of any such threat at the time deadly force is used.

86.     One form of training provided by the City is reality-based training in the form of a shooting simulator. In that simulator, officers are presented with scripted scenarios designed to place officers in real-world shoot/don't shoot

scenarios. The training provided to officers through those scenarios teach that it is permissible to shoot a suspected fleeing felon if that suspect has physically resisted arrest, without regard to any continuing imminent danger posed by the suspect.

87.    City policy and training provide that an officer may use deadly force against a suspected fleeing felon if the underlying crime involved the "threatened infliction of serious harm" even if that suspect does not pose an immediate or imminent danger of future harm to any person or officer.

88.    Officer Rolfe was consciously aware of the training he received from the City of Atlanta which set forth the circumstances in which deadly force was authorized when he shot and killed Rayshard Brooks.

89.    Officer Rolfe relied on the training he received from the City of Atlanta when determining whether to shoot Rayshard Brooks.

90.    The training received by Officer Rolfe from the City was the driving force behind his decision to shoot Rayshard Brooks as Brooks ran away.

**THE PATTERN OF UNCONSTITUTIONAL APPLICATION OF THE CITY'S DEADLY FORCE POLICY AND TRAINING**

91.    The City's policy and training related to the use of deadly force by its police officers is further demonstrated through the following examples.

*Maurice Hampton*

92.     On June 30, 2011, Officer Thomas Atzert pulled over a vehicle that was being driven by Maurice Hampton. See Brad Schrade & Jennifer Peebles, Unarmed and Shot in the Back, AJC, https://investigations.ajc.com/overtheline/ga-police-shootings/ (last visited Oct. 2, 2020).

93.     Maurice subsequently fled from the traffic stop and was pursued by Officer Atzert, who engaged in a physical struggle with Maurice. *Id.*

94.     When Maurice broke away from the struggle and began to run away, Officer Atzert shot him in the back, killing him. *Id.*

95.     Mr. Hampton did not pose an immediate danger to any person as he fled and the sole basis for the use of force against him was the City's policy and training that the use of deadly force was authorized because Hampton was a fleeing felon.

*Jamarion Robinson*

96.     On August 5, 2016, a task force that included Atlanta police officer William Sauls was attempting to arrest Jamarion Robinson for outstanding warrants. See Catherine Park, U.S. Marshals Task Force Accused of Excessive Force, Cover Up After Shooting Man 76 Times, 11 ALIVE (Jan. 10, 2018),

https://www.11alive.com/article/news/local/lawrenceville/us-marshals-task-force-accused-of-excessive-force-cover-up-after-shooting-man-76-times/85-506792680.

97.     The task force knew that Jamarion was schizophrenic and was not taking his medication. *Id.*

98.     When the task force attempted to arrest Jamarion, its members broke down the door of the apartment where he was located, entered the apartment, and began shooting their submachine guns and handguns at him. *Id.*

99.     Jamarion Robinson was ultimately shot 76 times. *Id.*

100.   In an ensuing cover-up, members of the task force claimed that Jamarion Robinson engaged in a shootout with officers. *Id.*

101.   In truth, however, Robinson was unarmed when they shot him 76 times. *Id.*

102.   Atlanta police officer William Sauls was not disciplined for his involvement in Jamarion's death and remained with the Atlanta Police Department, where he would continue to use excessive force. *Id.*

*Saleem Wilson*

103.   On December 22, 2018, Officers Ian Mayfield and Virginia Pena Barrientos approached Saleem Wilson and another man in a McDonald's dining room. See Janice Yu, *Atlanta Man Files Lawsuit Against APD and Officer*

Following 2018 Shooting, FOX 5 ATLANTA (June 24, 2020),

https://www.fox5atlanta.com/news/atlanta-man-files-lawsuit-against-apd-and-

officer-following-2018-shooting.

104.    Officers Mayfield and Barrientos confiscated guns that were among

the possessions of Saleem Wilson and the third party. Both men were then

unarmed. *Id.*

105.    Upon having his gun confiscated, Saleem Wilson got up and began to

run from the Officers, at which point he was simultaneously tased by Officer

Barrientos and shot in the back of his neck by Officer Mayfield with the third

party's gun (not his department-issued firearm). *Id.*

106.    After the shooting, Officers Mayfield and Barrientos lied about the

circumstances leading up to the shooting. *Id.*

107.    Officer Mayfield reported that Saleem shot himself with his own gun

while Officer Barrientos's statement did not mention seeing Officer Mayfield

pursuing Saleem with a gun in his hand or hearing a gunshot. *Id.*

108.    Both officers remain employed with the Atlanta Police Department,

even though the Fulton County District Attorney's Office is investigating the

incident for possible criminal charges. *Id.*

*Jimmy Atchison*

109.   On January 22, 2019, Officer Sung Kim was serving as part of a federal task force that was attempting to arrest Jimmy Atchison. See Christian Boone, New Details About FBI Task Force Shooting of Unarmed Man, AJC (Oct. 29, 2019), https://www.ajc.com/news/crime--law/new-details-about-fbi-task-force-shooting-unarmed-man/udjLPncbiB4ISAEcIvybSN/.

110.   When the task force attempted to arrest Jimmy, he fled the original location where he encountered law enforcement and hid in the closet of a friend's apartment. *Id.*

111.   When officers found Jimmy, he was unarmed and emerged from the closet with his hands up, at which point Officer Sung Kim shot Jimmy in the face, killing him. *Id.*

112.   As is routine practice by APD, Officer Kim was allowed to retire in lieu of termination. *See* Raisa Habersham, Atlanta Cop Retires After New Details Emerge in FBI Task Force Shooting, AJC (Nov. 1, 2019), https://www.ajc.com/news/local/atlanta-cop-retires-after-new-details-emerge-fbi-task-force-shooting/HneBGNgnBKhDdUp26FuNCL/.

*Prior incidents involving Officer Rolfe – Jackie Harris*

113.   The subject incident is not the first time Officer Rolfe unlawfully used his firearm under circumstances which did not authorize the use of deadly force.

114.   Officer Rolfe unlawfully used his firearm against Jackie Harris by shooting him in the back on August 2015 while Mr. Harris was not posing an immediate threat to authorize the use of deadly force

115.   None of the initial incident reports prepared by the involved officers reflected that Mr. Harris had been shot or seriously injured.

116.   After he was released from the hospital, Mr. Harris filed several complaints with APD against all three officers alleging that they used excessive deadly force by shooting him.

117.   To date, despite several open records act requests and follow-up communications thereafter, the City has not produced any documents which reflect that APD made any disciplinary findings or even completed an investigation into Mr. Harris' complaints against Officers Rolfe, Harp, and Castro alleging that they used unlawful deadly excessive force by shooting him.

118.   Officer Rolfe's Disciplinary Record as it pertains to the Harris incident reflects that as of June 14, 2020, said complaint remained unresolved.

119.   On May 10, 2016, Mr. Harris appeared before the Honorable Doris L.
Downs in the Fulton County Superior Court to enter a plea in *State of Georgia v.
Jackie Harris*, Indictment No. l5SCl37198.

120.   Based on the incident report and evidence presented to the Court at or
before the plea hearing on May 10, 2016, the Court publicly chastised each of the
three officers – Officers Rolfe, Harp, and Castro – in open court for their
misconduct in failing to include in their reports that they used their firearms and
shot Mr. Harris:

> AND THE KICKER IS THAT THE POLICE —— NONE OF
> THE POLICE PUT IN THE REPORT THAT THEY SHOT
> THE MAN, NONE OF THEM, AND THEY SENT HIM TO
> GRADY WITH COLLAPSED LUNGS AND EVERYTHING,
> AND THE REPORT DOESN'T MENTION IT. I AM
> ETHICALLY GOING TO BE REQUIRED TO TURN ALL OF
> THEM IN. . . .I MEAN TO THE POLICE, AN
> INVESTIGATION. I MEAN, SOMEBODY NEEDS TO LOOK
> INTO THIS. THIS IS VERY STRANGE.
>
> WELL, TO ME YOU COULD STUDY THIS CASE FOR THE
> REST OF YOUR LIFE. I INTEND TO TURN IT IN TO
> INTERNAL INVESTIGATION OF SOME KIND, OR THE
> GBI. I THINK IT'S THE WILDEST CASE I'VE EVER SEEN
> IN MY 34 YEARS HERE.

121.   Despite the matter being referred for investigation by the Court, the
City of Atlanta took no investigatory or disciplinary action against Officers Rolfe,
Harp, or Castro in connection with the Harris incident, whether related to their

unlawful use of deadly force or their failure to accurately report the same in their incident reports.

122.   Had APD properly investigated Officer Rolfe's improper use of a firearm in using deadly force against Mr. Harris, it would have concluded that deadly force was not authorized under the circumstances presented and that Rolfe's use of deadly force was excessive and violated Mr. Harris' constitutional rights as well as APD policy.

*Prior incidents involving Officer Rolfe – Antraveious Payne*

123.   On September 15, 2016, Officer Rolfe was involved in another incident involving the improper use of his firearm wherein Rolfe retrieved and pointed his gun against Antraveious Payne under circumstances which did not authorize the use of deadly force.[2]

124.   APD sustained the firearms violation against Rolfe and concluded that by retrieving his firearm and pointing it at a suspect in circumstances which did not authorize the use of deadly force, Officer Rolfe improperly "used" his firearm in violation of APD policy.

_____
[2] The Payne incident is described more fully below and involved the unconstitutional and criminal use of force by a second Atlanta police officer.

125.    Officer Rolfe's Disciplinary History record as it pertains to the Payne incident reflects that APD sustained a violation for improper use of firearms against Officer Rolfe, and issued a written reprimand for a Category "A" violation:

**16I0644UAF      Case #: 162591782      Use of force**

6.09 Use of Firearms 09/19/2016 [A] - SUSTAINED Oct 5, 2017

Related actions taken:
    Oct 5, 2017 WRITTEN REPRIMAND

126.    Pursuant to APD policy, sustained policy violations are categorized into four different categories ranging from A to D, with the severity of misconduct and mandatory disciplinary action progressively increasing – "Category 'A' infractions represent the least egregious kind of misconduct while categories 'B,' 'C,' and 'D' represent progressively more serious types of misconduct." APD SOP 2020 4.4.1.

127.    Category "A" violations are only reserved for minor rule violations such as work appearance, tardiness, and failing to appear for court which do not include improper use of a firearm.

128.    A sustained finding that an officer improperly used a firearm is not a minor rule violation and is at a minimum a Category "B" violation.

129.   On July 25, 2017, Officer Rolfe's supervisor completed his Disciplinary Worksheet and properly categorized his improper use of a firearm as a Category "B" violation.

130.   Officer Rolfe's Category "B" violation for improper use of his firearm in connection with the Payne incident occurred within the reckoning period of the Harris incident wherein he likewise improperly used his firearm.

131.   A Category "B" violation "occurring within the reckoning period of a same, similar or related past violation is increased another category level." APD SOP 2020 4.4.3.

132.   At a minimum, Officer Rolfe's sustained Category B violation for improper use of a firearm in connection with the Payne incident should have been increased to Category C with a mandatory discipline range of a 4-15 day suspension and/or demotion. APD SOP 2020 4.4.4.

133.   Without explanation, APD did not increase Officer Rolfe's sustained Category B violation to a Category C as required by mandatory policy, and instead improperly decreased it to a Category A violation on or about October 5, 2017 for which he only received a written reprimand.

**THE CITY'S PRACTICE OF IGNORING OFFICER'S FALSE JUSTIFICATIONS OR COVERUPS CONCERNING THE USE OF FORCE**

134.   The City of Atlanta Police Department has a custom and practice of accepting false versions of police officers concerning its officers' use of physical force.  The effect of this practice resulted in the death of Rayshard Brooks.

135.   The City of Atlanta, by and through the recurrent practices of its police officers, including those charged with the investigation of civilian complaints of police abuse, has a custom and practice on the part of its offices as follows:

a.      an officer commits an act of violence or an act of other breach of the constitutional rights of a civilian;

b.      said officer falsely reports that they did not engage in the act of violence nor any other act constituting a breach of the constitutional rights of a civilian;

c.      both the officer, along with and those officers designated to supervise that officer or to investigate the conduct of the officer, accept the officer's false statement concerning their conduct towards the civilian and either refuse or fail to even report the physical misconduct or, if they report that an incident occurred, they adopt the officer's false version of events despite immediately available evidence contradicting the officer's false version.

136.   By way of example, APD failed to conduct meaningful investigations of the following complaints wherein multiple officers were alleged to use gratuitous, excessive force without justification:

*Tyrone Carnegay*

137.   In October 2014, Officer Trevor King was off-duty and working security at a Walmart store when he attempted to detain Tyrone Carnegay, who he believed to be shoplifting a tomato. See Ex-Atlanta Cop Gets 5 Years for Beating Walmart Customer Over 'Stolen' Tomato, AJC (May 8, 2018), https://www.ajc.com/news/crime--law/atlanta-cop-gets-years-for-beating-walmart-customer-over-stolen-tomato/jSnD2Crf5H94c9WjeU5p9I/.

138.   When Tyrone Carnegay attempted to exit the store, Officer King struck him seven times with a metal baton, breaking two bones in his legs (including a severe a compound fracture). *Id.*

139.   Incredibly, Officer King then arrested his victim and charged him with obstructing a police investigation and assaulting a police officer. *Id.*

140.   Officer King lied in the police report that he filed following the incident and indicated that Tyrone Carnegay reached for a gun. *Id.*

141.   Surveillance footage revealed that these claims were not true, and Officer King was federally charged with using unreasonable force and falsifying a police report. *Id.*

142.   Despite the shocking conduct and criminal charges, Officer King was not fired from the APD. Instead, he was permitted to retire. *Id.*

143.   As a result of APD permitting King to "retire" rather than be terminated, King was able to keep retirement benefits and APD was able to avoid tacitly acknowledging that its employee engaged in wrongful conduct.

144.   Officer King was nonetheless ultimately convicted on federal charges and sentenced to five years in prison. *Id.*

*David Childs*

145.   On May 7, 2003, an uninterested bystander observed Defendant Gardner strike a handcuffed arrestee (David Childs) in the face with his knee and/or his gun while the arrestee was seated inside the Zone 3 precinct where surveillance videos were installed (the "Childs incident"), and informed APD of the same; despite the bystander's willingness to submit to a lie detector test to confirm his veracity, APD did not perform a lie detector test, and did not review the available surveillance video footage which would have confirmed or denied the allegation against Gardner; APD had knowledge that the head wounds Childs

sustained during his arrest suddenly re-opened and began bleeding again while he was handcuffed at the precinct, but did not make any inquiry as to how the arrestee was re-injured at the precinct. APD opened and closed its investigation without confirming or denying whether the allegation that Gardner used excessive force at the precinct was true.

*Raymond Clay*

146.   On July 1, 2006, an arrestee (Raymond Clay) informed APD that Defendant Mark Gardner struck him in the head with a two-way radio and kicked him while he was not resisting. APD opened and closed its investigation without confirming or denying whether the allegation that Gardner used excessive force was true.

*Jermichael Lockette*

147.   On November 10, 2006, Jermichael Lockette informed APD that 2 APD officers - Defendant Streeter and/or Val Lester - used excessive force by suddenly punching him in the face and ripping out four dreadlocks from his head during an investigatory stop (the "Lockette incident").

148.   Although both officers denied striking Lockette and claimed that they were unaware how he had sustained his confirmed injuries, APD administered a

Computer Voice Stress Analysis ("CVSA") to both officers on March 16, 2007 which indicated deception when the officers denied using force against Lockette.

149. Based on the officers' deception, on or about May 21, 2007, APD concluded that the allegations of excessive force were SUSTAINED and issued oral reprimands to both officers.

150. On November 4, 2008, APD administered a CVSA to Lockette, which confirmed that no deception was indicated with regard to his allegations regarding the officers' use of force.

151. On December 24, 2008, APD prepared a new Investigation Disposition Form for the Lockette incident which, without explanation, now concluded that Streeter and Lester used reasonable force and recommended that the allegation that the officers punched Lockette in the face and pulled his dreadlocks out from his head be rescinded and changed to "NOT SUSTAINED."

152. Without offering any explanation, on or about June 15, 2009, APD adopted the recommendation and formally rescinded its prior finding that Streeter and Lester used excessive force by punching Lockette in the face and pulling his dreadlocks out from his head, and changed the disposition in both officers' disciplinary files to "NOT SUSTAINED."

153.   At no point was either officer investigated, reprimanded, or disciplined for failing to intervene in the other officer's sustained use of excessive force in connection with the Lockette incident.

*Karla Weems*

154.   Karla Weems informed APD that on June 28, 2011, 4 APD officers from the Fugitive Unit broke through the front door of her home, handcuffed all occupants, and searched her home without a warrant. One of the handcuffed occupants, Mike Gibbs, informed APD that an officer dragged him outside and threw him to the ground, face-first, after he was handcuffed and not resisting. Another occupant, Rontavious Loyal, informed APD that another officer kicked him and threw him to the ground outside.  The officers released all occupants after determining that the subject of their search was not present.  APD did not subject any of the officers who were present to CVSDs and instead closed its investigation without confirming or denying whether the allegation of excessive force was true.

*Ezoeke Parks*

155.   Ezoeke Parks informed APD that on August 23, 2011, 2 APD Officers - Jose Vidal and Norattam Holden - beat her and her daughter, informing APD that: (i) Officer Vidal kicked her in her stomach, dragged and pulled her by her hair, and kneed her in her back during her arrest; and (ii) that Officer Holden

grabbed her 14-year old daughter by her neck and kneed her in her stomach. The ACRB concluded that there was sufficient evidence to sustain the citizen's allegations of excessive force against both officers and recommended to APD that the officers be suspended and undergo psychological evaluation. APD rejected the ACRB's recommendation, and instead concluded that there was insufficient evidence to sustain the allegations of excessive force against either officers without subjecting anyone to a CVSD. More specifically, APD explicitly concluded that pulling the citizen's hair was a reasonable "method to ensure that she was handcuffed." APD did not investigate or discipline either officer for failing to intervene in the other's use of excessive force.

*Bailey Cato*

156.   Bailey Cato informed APD that on September 14, 2014, 2 APD officers - Michael Soprano and Matthew Johns - pepper-sprayed him and repeatedly punched him in the face and beat him without provocation. APD and the Chief rejected the ACRB's finding that the allegation that these 2 APD officers used excessive force and rejected ACRB's recommendation that the officers be suspended and receive additional training, and did not impose any discipline on the officers for their use of excessive force. Moreover, APD did not investigate or

discipline either officer for failing to intervene in the other's use of excessive force.

*Richard Williams*

157. Richard Williams informed APD that on March 31, 2015, after several APD officers in the Fugitive Unit stormed into his motel room to arrest him, an unidentified APD officer struck him in the head with a silver revolver while he was not resisting arrest. Despite confirming that the arrestee sustained a gaping two-inch headwound during his arrest which required treatment at the hospital, none of the __ officers present during the arrest could explain how Williams sustained said injury and provided conflicting accounts of the events that occurred during the arrest. APD did not subject any officers to CVSDs and instead closed its investigation without confirming or denying whether the allegation of excessive force was true.

*Dr. Jay Berger*

158. On the evening of August 25, 2012, Dr. Jay Berger was arrested by Officer Lawrence of the City of Atlanta Police; Mr. Berger filed a complaint with the City alleging that the officer struck his knee with such force that it tore his ACL and caused other bodily harm during his arrest, ultimately requiring hospitalization and surgery; the City blindly accepted the officer's unsupported

denials of wrongdoing and denial of knowledge of any force being used on

Berger's knee, despite the absence of any explanation as to how Berger sustained a

documented serious knee injury during arrest; the City continued to accept the

officer's denial of the use of any force upon Berger even after a civil trial in federal

court resulted in a verdict in favor of Berger finding that Lawrence had used

excessive force against Berger.

*Randal Brooks*

159.   In March of 2010, Randal Brooks was arrested and tackled to the

ground by Officers Alexander and Murden of the City of Atlanta Police

Department.

160.   Before being tackled he was uninjured and fully able to walk.  Once

taken to the ground, Randal Brooks was on his stomach and the two officers forced

their knees into his spine and neck area.

161.   During his arrest, Randal Brooks' spine was fractured and he was

paralyzed as a result of physical force applied directly to his spine.

162.   The nature of his spinal injury was documented to be consistent with a

knee having been positioned onto his spine, accompanied with a significant

amount of force  applied to his spine. There is no other available explanation for

just how Randal Brooks' spine was fractured. Brooks remained paralyzed from the neck down throughout the remainder of his life; he died in 2012.

Each of the officers at the scene of Randal Brooks' arrest claimed that they did not apply, nor did they see any other officer apply, any force to Brooks' cervical spine. Despite the catastrophic nature of the injury, the officers repeated their claims to superior officers who merely accepted their story. The City of Atlanta continued to accept the officers' denial of the use of force upon Randal Brooks both before and after settlement of Randal Brooks' Estate's claim.

*Robert Doe*

163.   Another example of this custom and practice involves Robert Doe. The last name is withheld because the victim of the officer's force was a minor at the time. In December of 2019, Robert Doe's legs were shattered by the reckless use of force by Atlanta Police Officer Erik Clanton.

164.   Robert was alleged to be selling water bottles to passing motorists when he was approached by Clanton and another officer in mid-town Atlanta.

165.   Fearful of police officers, Robert ran away. Robert reached and scaled a fence. As Robert reached the other side of the fence, below which was a 20-30 foot drop to a highway, Clanton forcefully ran into the fence—twice—

causing Robert to lose his grip on the fence and causing him to fall. The fall shattered his legs and caused a broken shoulder and facial fractures.

166.   Officer Clanton falsely reported that, rather than causing Robert's fall, he had "attempted to reach for" Robert to pull him down from the fence.

167.   Despite the availability of graphic video evidence contrary to Clanton's report, The City of Atlanta accepted Clanton's denial of use of force on Robert.

*Antraveious Payne*

168.   On September 16, 2016, Atlanta police officer Matthew Johns was involved in a police chase and was pursuing a vehicle in which Antraveious Payne, a teenager, was an occupant. *See* Asia Simone Burns, Ex-Atlanta Officer Sentenced to 5 Years in Prison After Kicking, Choking Teen (Aug. 26, 2019), https://www.ajc.com/news/crime--law/atlanta-officer-sentenced-years-prison-after-kicking-choking-teen/uRKXtUia2i7g7qHuNEfTcM/.

169.   After the police chase ended, Antraveious exited the vehicle and laid on the ground with his hands up; he was unarmed and obviously surrendered. *Id.*

170.   Nonetheless, Officer Johns ran up to Antraveious, kicked him in the head three times, and pressed his knee on the teenager's neck until he was unconscious. *Id.*

171. Officer Johns lied about the circumstances leading up to his use of force and repeated these assertions in written statements to cover-up the excessive nature of the force that he used. *Id.*

172. Officer Johns was fired by the Atlanta Police Department for his use of force against Antraveious and was indicted on criminal charges. *Id.*

173. Officer Johns ultimately pleaded guilty to three counts of aggravated assault, one count of aggravated assault/strangulation, two counts of making a false statement, and two counts of violating his oath of office. *Id.*

174. Officer Johns received a twenty-year sentence including five years in prison. *Id.*

*Messiah Young and Teniyah Pilgrim*

175. On May 30, 2020, six Atlanta police officers—Ivory Streeter, Mark Gardner, Lonnie Hood, Armon Jones, Willie Sauls, and Roland Claud—engaged in the use of excessive force against two college students that were leaving a protest against police brutality. See Phil Helsel & Austin Mullen, 2 More Atlanta Police Officers Fired Over Use of Force During Protest, NBC NEWS (June 10, 2020), https://www.nbcnews.com/news/us-news/2-more-atlanta-police-officers-fired-over-use-force-during-n1229656.

176. Messiah Young and Teniyah Pilgrim were driving down the road when they were stopped by officers who were enforcing a curfew that was issued by Mayor Keisha Lance Bottoms. *Id.*

177. Without giving the students any time to respond to their commands, the officers broke the driver's side window with a baton, tased them both, and took them into police custody. *Id.*

178. The incident was broadcast live on television, prompting a quick response from the City of Atlanta and the Atlanta Police Department. *Id.*

179. All six officers were charged with crimes for their roles in the incident, including charges of aggravated assault, aggravated battery, and criminal damage to property. *Id.*

180. Officers Streeter and Gardner were fired the day after the incident while Officers Hood and Jones were fired around a month later. *Id.*

181. Officers Sauls and Claud remain employed with the City of Atlanta despite the criminal charges that are pending against them for aggravated assault (Officer Sauls) and criminal damage to property (both officers).

182. Alarmingly, Officer Sauls has been involved in three fatal shootings of unarmed men, yet still remains employed with the Atlanta Police Department. See Brad Schrade & Jennifer Peebles, APD Cop in Tasing Incident Faced Earlier

Excessive Force Allegations, AJC (June 4, 2020),

https://www.ajc.com/news/crime--law/apd-cop-tasing-incident-faced-earlier-excessive-force-allegations/9ajNXyELh8hWweqNF8Yh9J/.

### The prevalence of other incidents reinforces the City's need to train its officers

183.    Each of the following cases involves the use of deadly force against a fleeing suspect.

a.    In October 2015, Atlanta sustained firearms use violation by Officer Emanuel Thompson because the suspect did not pose a serious threat of injury, without reference to immediacy or seriousness of physical threat. The City did not terminate or discipline officer; allowed him to resign a year after the shooting.

b.    In December 2017, Altman Hall was shot by an APD officer while standing in a door way while, unarmed, during a standoff without.

c.    In February 2018, an APD officer shot a person who fled after officers arrived based on a "suspicious person" report.

d.    In May 2018,  an officer discharged his weapon at two juvenile suspects who were fleeing police.

e.    In June 2018,  an APD Officer shot a citizen after first pepper spraying and tasing him.

f.     In January 2019, a plain clothes APD officer shot at a suspect who was driving away from a gas station but who posed no other direct threat to the officer or the public. In March 2019, Officer Officer Marquee Kelley shot and killed a fleeing suspect.

### Count I
*Excessive Force under 42 U.S.C. § 1983*
*and Battery under  O.C.G.A. § 51-1-13*
*against Officer Rolfe*

184.    When Officer Rolfe shot and killed Mr. Brooks, Mr. Brooks did not pose an immediate threat of serious physical harm or death to other persons and, as a result, Rolfe's use of deadly force was unjustified and constituted a violation of the Fourth Amendment of the United States Constitution.

185.    Based on the totality of facts and circumstances described herein, no reasonable officer could have believed that Mr. Brooks posed any immediate threat of serious physical harm or death to any person while he was running away with his back to the officers.

186.    Every reasonable officer would have known that the force used by Rolfe was unreasonably disproportionate and excessive and would violate Mr. Brooks' Fourth Amendment rights.

187.    Rolfe violated clearly established law and is not entitled to qualified immunity for his use of deadly force in shooting Mr. Brooks.  Rolfe's use of force

against Mr. Brooks after Mr. Brooks was wounded and lying on the ground constituted an assault and battery upon Mr. Brooks.

188.   By virtue of the facts described herein, the actions of Officer Rolfe constitute assault and battery under Georgia law; a violation of Article I, Paragraph XIII of the Constitution of the State of Georgia; and abuse in being arrested in violation of Article I, Paragraph XVII of the Constitution of the State of Georgia.

189.   Rolfe acted with actual malice and an intent to injure Mr. Brooks by using deadly and excessive force such that he is not entitled to official immunity under state law.

190.   As a result of Rolfe's unlawful conduct, Plaintiff sustained injuries and pain in advance of his death, and sustained injuries which caused Mr. Brooks' death.

## Count II
*Excessive Force under 42 U.S.C. § 1983*
*and Battery under O.C.G.A. § 51-1-13*
*against Officer Rolfe*

191.   While Mr. Brooks was bleeding on the ground, Rolfe and Brosnan had knowledge that Brooks sustained two gunshot wounds directly into his back, and had knowledge that Mr. Brooks' gunshot wounds were serious and required immediate medical attention.

192.    Rather than render medical aid to Mr. Brooks or make any effort to do so, Officer Brosnan placed his foot on Mr. Brooks' shoulder; Officer Rolfe forcefully kicked Mr. Brooks, at which point Mr. Brooks was still alive but in need of immediate medical attention and physically helpless.

193.    Rolfe's kick caused Brooks unnecessary physical pain.

194.    Rolfe's kick was obviously unnecessary and at the time Rolfe kicked Brooks, Brooks posed no threat whatsoever to any person.

**Count III**
*Deliberate indifference to medical needs*
*under 42 U.S.C. § 1983*
*against Officers Rolfe and Brosnan*

195.    After Mr. Brooks was shot twice in the back, he immediately fell to the ground.

196.    Mr. Brooks was still alive but was physically helpless while bleeding from his gunshot wounds on the ground, at which point Mr. Brooks was in the full control of Brosnan and Rolfe, posed absolutely no risk of harm to anyone, and was physically incapable of resisting arrest.

197.    While Mr. Brooks was bleeding on the ground, he was not resisting arrest, was not attempting to flee, and was not posing any threat of harm to the Officers or any other person.

198.    Brosnan and Rolfe's conscious decision to physically assault Mr.

Brooks rather than render medical aid to his serious gunshot wounds constitutes

deliberate indifference to Mr. Brooks' serious medical needs in violation of the

Fourteenth Amendment.

199.    Every reasonable officer with knowledge that Brooks had sustained

two serious and potentially deadly gunshot wounds to his back would have known

that standing on Brooks' shoulder and kicking him while he was still alive and

bleeding on the ground, rather than render immediate medical aid, would violate

Mr. Brooks' Fourteenth Amendment rights to medical treatment.

200.    Brosnan and Rolfe are not entitled to qualified immunity for their

failure to render medical aid to Mr. Brooks in violation of the Fourteenth

Amendment and are liable for the damages resulting from the same.

201.    The policies and procedures of the City of Atlanta Police Department

which direct that medical aid be rendered by its officers constitutes a ministerial

duty.  Defendants Rolfe and Brosnan each breached that ministerial duty through

their negligent or intentional conduct and, as result, are subject to liability to the

Estate of Mr. Brooks for the pain caused him during his last remaining moments of

life.

## Count IV
### *Municipal liability under 42 U.S.C. § 1983*
### *against the City of Atlanta*

202.    The City's insufficient oversight of use of deadly force incidents, unconstitutional policy, and inadequate training create an overwhelming risk that its officers will use deadly force when doing so is unconstitutional.

203.    The Chief of Police is the final policy maker for all matters related to the training and discipline for officers employed by the of City of Atlanta.

204.    When she took office as Chief of Police, Chief Erika Shields had knowledge of the City's widespread pattern and practice of APD officers improperly using department-issued firearms and excessive deadly force in circumstances which do not authorize the use of deadly force and knowledge of the substantial risk that officers would violate the Constitution if this custom was allowed to continue uncorrected; Chief Shields nevertheless took no remedial action during her tenure as Chief and allowed the unconstitutional custom to continue.

205.    The frequency with which officers use deadly force when trying to apprehend a fleeing suspect reinforces the need for the City to provide competent and thorough training on the circumstances which authorize the use of deadly force.

206.    In spite of knowledge that its officers fail to abide by City policy when reporting their uses of force, and fail to report the use of deadly force, the City has taken no action.

207.    In spite of knowledge that its officers have used deadly force to apprehend fleeing suspects in violation of the Fourth Amendment of the Constitution, the City has taken no action.

208.    The City's failure to train its officers, and specifically failure to both discipline and train Officer Rolfe, were the driving force behind Rolfe's belief that deadly force was authorized, and the driving force behind Rolfe's decision to use deadly force against Rayshard Brooks.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request:

a.    That the Estate of Rayshard Brooks be awarded damages from the Defendants for the pain and suffering of Rayshard Brooks prior to his death and be awarded all damages, including special, nominal, punitive, and compensatory damages permitted by operation of federal and Georgia law. The Estate does not seek punitive damages against the City of Atlanta.

b.     That Tomika Miller be awarded judgment against Garrett Rolfe and the City of Atlanta for all damages permitted by law for the wrongful death of Mr. Rayshard Brooks including compensatory damages as measured by the full value of Mr. Brooks' life and punitive damages against Garrett Rolfe. Ms. Miller does not seek punitive damages against the City of Atlanta.

c.     That both Plaintiffs recover attorney's fees pursuant to 42 U.S.C. § 1988;

d.     That a trial by jury be had upon all issues so triable; and,

e.     That the Plaintiffs be awarded such other and further relief to which they are legally entitled.

Submitted this 12th day of November, 2021.

**L. Chris Stewart**
Georgia Bar No. 142289

**Brian Spears**
Georgia Bar No. 670112

**Dianna Lee**
Georgia Bar No. 142289

**Jeff Filipovits**
Georgia Bar No. 825553

Stewart Miller Simmons
55 Ivan Allen Blvd., NW, Suite 700
Atlanta, GA 30308
844.874.2500
cstewart@smstrial.com
dlee@smstrial.com

Spears & Filipovits, LLC
1126 Ponce de Leon Ave. NE
Atlanta, GA 30306
404.905.2225
bspears@civil-rights.law
jeff@civil-rights.law

**CERTIFICATE OF SERVICE**

I certify that I served the foreign foregoing document by filing the same with the Clerk of using the CM/ECF system which will automatically send email notification of such filing to all counsel of record.

This 12th day of November, 2021.

**Jeff Filipovits**
Georgia Bar No. 825553
Spears & Filipovits, LLC
1126 Ponce de Leon Ave.
Atlanta, GA 30306
404.905.2225
jeff@civil-rights.law