IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| TOMIKA MILLER and the ESTATE OF | : | |
| RAYSHARD BROOKS, by and through | : | |
| Tomika Miller, Administrator, | : | CIVIL ACTION |
| Plaintiffs | : | |
| | : | FILE NO. 1:21-CV-03752-SDG |
| v. | : | |
| | : | |
| THE CITY OF ATLANTA, GEORGIA; | : | |
| GARRETT ROLFE, in his individual | : | |
| capacity; DEVIN BROSNAN, in his | : | |
| individual capacity, | : | |
| Defendants. | : | |

## DEFENDANTS GARRETT ROLFE AND DEVIN BROSNAN'S
## BRIEF IN SUPPORT OF MOTION TO DISMISS

COME NOW, Defendants Garrett Rolfe and Devin Brosnan (collectively "Defendant Officers"), and hereby file this Brief in Support of Motion to Dismiss Plaintiffs' First Amended Complaint (Doc. 26), and show as follows:

## I.   INTRODUCTION

This lawsuit arises from the death of Mr. Rayshard Brooks after an encounter with Atlanta Police Officers Devin Brosnan and Garrett Rolfe.  Brooks fell asleep at the wheel of his car while in a drive-thru at a Wendy's on University Avenue in Atlanta, Georgia. A Wendy's employee called 9-1-1 and Officer Brosnan responded to the scene.  After an initial investigation, Officer Brosnan requested a DUI certified officer, and Officer Rolfe responded.  After conducting a DUI investigation, Officer Rolfe determined that

Brooks should be arrested because he'd "had too much to drink to be driving." When the Defendant Officers attempted to place Brooks under arrest, Brooks resisted, violently struggled with the Defendant Officers taking them all to the ground, refused to obey lawful commands, punched Officer Rolfe in the face, grabbed a weapon (a Taser) from Officer Brosnan and deployed that weapon at Brosnan, and then ran off. As Brooks sought to escape, he turned and discharged the weapon at Rolfe. Rolfe discharged his service weapon three times striking Brooks twice, of which wounds Brooks later died. Video shows that within a few seconds a DUI investigation escalated into a violent struggle initiated by Brooks during which he committed multiple forcible felonies against the officers and from which Brooks emerged with a police weapon, that he turned on both officers.

There is undisputed or indisputable video evidence that establishes that the Defendant Officers' actions at the Wendy's that evening were reasonable as a matter of law, or at the very least they enjoy qualified immunity under federal law and official immunity under Georgia law from litigation and liability. The Court is entitled to consider this video in ruling on Defendant Officers' motion. Scott v. Harris, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 1776, 167 L. Ed.2d 686 (2007) (clear video or photographic evidence cannot be disputed by verbal testimony); Cantrell v. McClure, 805 Fed. Appx. 817, 819 n.2 (11th Cir. 2020). The videos flatly contradict Plaintiffs' conclusory assertions contained in the First Amended Complaint.

Tomika Miller, the widow of Rayshard Brooks, has filed a Four Count First Amended Complaint (Doc. 26) against the Defendant Officers and the City of Atlanta. This motion addresses Counts One, Two and Three, the counts directed at the individual officers.  Count One alleges excessive deadly force and battery against Officer Rolfe. Count Two alleges excessive force in that after Brooks was shot, rather than render aid, Officer Brosnan placed his foot on Brooks' shoulder and Officer Rolfe kicked Brooks. Count Three alleges that the Defendant Officers violated Brooks' Fourteenth Amendment rights by being deliberately indifferent to serious medical needs.  The Defendant Officers are entitled to judgment as a matter of law on all three counts.

## II.   STATEMENT OF FACTS

On the evening of June 12, 2020, Rayshard Brooks was in the driver's seat of a vehicle in the drive-thru line at the Wendy's restaurant located at 125 University Avenue, City of Atlanta, Georgia. *First Amended Complaint ("FAC"). ¶ 9.* A Wendy's employee called 9-1-1 and reported that he was asleep in his vehicle and stopped in the drive-thru lane. *FAC ¶¶ 10, 11.* Officer Brosnan was dispatched to the scene. *FAC ¶ 12.* Officer Brosnan arrived on the scene and conducted an initial investigation. *FAC ¶¶ 14-19; Brosnan Body Worn Camera ("BWC")[1] 22:42:04ff.*

---

[1]Defendants refer to the time stamps on the BWCs and dash cams located in the top right-hand corners.  The first series of numbers "2020-06-12" are the date, and the next series of numbers are time in military time.  The dash cams are not calibrated as to the actual time.  Other video without such time stamps will be referenced by the running time of that particular video, usually in the lower middle or left-hand side.

Brosnan arrived, parked his car and walked over to Brooks' car. *Brosnan BWC 22:42:04-:16*. Brosnan had to bang on the window and ultimately open the driver's door, requiring almost a minute to awaken Brooks. *Brosnan BWC 22:42:10-:59*. The other cars were having to drive around Brooks' stopped car. *Brosnan BWC 22:43:04*. Brosnan asked him "are you good," and Brooks indicated that he was, so Brosnan told him to move and "pull somewhere and take a nap," if necessary. *Brosnan BWC 22:43:00-:41*. Brosnan walked back towards his car but then realized Brooks was not moving. Brosnan walked back over and Brooks again had fallen asleep at the wheel. *Brosnan BWC 22:44:17-:21*. Brosnan told him not to go back to sleep, but to pull over into a parking space, which he did. *Brosnan BWC 22:44:20-:30*.

Brosnan asked some preliminary questions and requested his license, which Brooks struggled to locate. *Brosnan BWC 22:48:09-49:18.* Believing Brooks to be impaired, Brosnan radioed for a DUI certified officer, and Officer Rolfe was dispatched to the scene. *Brosnan BWC 22:49:19-50:01*. Rolfe arrived at the scene about six minutes later. *Brosnan BWC 22:56:00*.

Officer Rolfe proceeded to conduct a thorough DUI investigation, asking Brooks to exit his vehicle and questioning him outside the vehicle.[2] *Brosnan BWC 22:57:06 ff.*

---

The video and records cited herein can be electronically linked from the motion.

[2] Brooks told the officers that the car he was driving was a rental. *Brosnan BWC 22:58:05-:09.* Brooks also made several incorrect and inconsistent statements about how he was not driving, that he was not asleep in the Wendy's drive through, how he

*Rolfe BWC 22:57:10ff.*   The investigation included field sobriety tests.   *23:03:15ff.* Eventually Officer Rolfe requested, and Brooks agreed, to blow into a roadside alco-sensor device.   *Brosnan BWC 23:21:21-:37*; *Rolfe BWC 23:21:22-:33.*   After Officer Rolfe completed his investigation, Officer Rolfe informed Brooks that "he had too much to drink to be driving" and "to put your hands behind your back."   The officers reached to place Brooks in handcuffs.   *Rolfe BWC 23:23:09-:16; Brosnan BWC 23:23:13-:25.* In that instant, after several minutes of being compliant, Brooks became violently resistive then failed to obey lawful commands and.   *Brosnan BWC 23:23:20-:59; Rolfe BWC 23:23:16-:58; Rolfe Dash Cam 03:23:21-:59; Brosnan Dash Cam 03:23:21-:54.* All three fell to the ground as the Defendant Officers struggled to arrest Brooks. Eventually Brosnan fell back with Brooks on top of him and Brosnan hit his head. *Brosnan Dash Cam 03:23:44-:50; Rolfe Dash Cam 03:23:45-:48.*

Defendant Officers told Brooks several times to "stop fighting" and "you're going to get tased."   Brooks grabbed Officer Brosnan's Taser, and Brosnan can be heard yelling "hands off the Taser."   *Brosnan BWC 23:23:35-:38.*   Brosnan yelled he "got my fucking Taser."   *Brosnan BWC 23:23:50-52; Rolfe BWC 23:23:45-:49; Quenesha Brown Video 0:21-0:27; Rolfe Dash Cam 03:23:33-:56.*   Brooks continued to resist arrest, continued to refuse to obey lawful commands, and then committed the offense of

---

got to the Wendy's, what he drank, how much he had to drink, where he was, and what County he was in.   *Rolfe BWC 22:57:10 ff.*

felony obstruction of the police officer by punching Officer Rolfe in the face with his fist. *Rolfe Dash Cam 03:23:50-:53; Quenesha Brown Video 0:21*. After committing other forcible felonies, including aggravated assault, Brooks, having stolen the Taser, is seen pointing the Taser at Brosnan's face and a pop is heard when Brooks deployed one of the two cartridges.[3] *Rolfe Dash Cam 03:23:53-:55.* Rolfe deployed his Taser but did not get full probe contact and Brooks ran. *Brosnan BWC 23:23:53-:57*; *Rolfe Dash Cam 03:23:52-:56*; *Quenesha Brown Video 0:22-0:28*. Brosnan got up and radioed "63."[4] *Brosnan BWC 23:23-57-:59*; *Rolfe BWC 23:23:52-:54, Rolfe Dash Cam 03:23:23:23-5.*

Brooks ran taking the stolen police weapon with him. *Enhanced Wendy's Video 0:00-0:38[5]; Quenesha Brown Video 0:00:25-:29; Rolfe Dash Cam 03:23:55-:58.* As can be seen in both Wendy's Videos, Brooks turns, lifts the weapon and discharges the weapon at Rolfe who is attempting to stop Brooks' escape. *Enhanced Wendy's Video 0:00; Slowed down side by side Wendy's video 23:22:47-50[6]*. Those videos clearly show Brooks turning and discharging the weapon at Rolfe. The flash and the sound of the

---

[3] Officer Brosnan was able to use his left arm to deflect the Taser from striking him in the face. *Rolfe Dash Cam 03:23:54*. Contrary to the allegation of the FAC, Brosnan was certified to carry and use the Taser 7. *Brosnan Taser Certification*.

[4] A "63" is officer in distress. This is an extreme distress call to which all available police units respond.

[5] These videos do not have time stamps so the references are to the running time located at the bottom of the video.

[6] The left side of the video has time stamp.

weapon being discharged can be seen and heard on the Wendy's and Bystander Video. *Bystander Video IMG_2206 0:00-0:19; Enhanced Wendy's Video 0:00; Slowed down side by side Wendy's video 23:22:47-:48.* While it is not as loud as Rolfe's handgun, heard a second later, there is a loud pop like a firearm. *Bystander Video IMG_2306 0:05-0:09.*

Faced with a fleeing arrestee, and now a suspected felon, who had stolen a weapon, attacked both officers and discharged a weapon at him, Rolfe discharged his service weapon three times. *Bystander Video IMG_2206 0:07-:09.* Two of the shots struck Brooks, who fell to the ground. *FAC ¶ 59; Enhanced Wendy's Video 0:02.* From the time the Defendant Officers initiated Brooks' arrest until shots are heard is 48 seconds, the very definition of a tense, uncertain and rapidly evolving situation. *Rolfe BWC 23:23:10-:58.*

As can clearly be seen from videos and contrary to the allegations of the Complaint, neither officer kicks or otherwise abuses Brooks while he is on the ground; instead, he is flipped over and straddled. *Bystander Video IMG_2207; Enhanced Wendy's Video.* Officer Brosnan is seen on video talking into his mic and the radio reflects him stating shots fired. *Enhanced Wendy's Video 0:00:06-:07; Z3 Radio Comm. 2316 through 2330, 6:33-35.* Seconds later, Brosnan radios "we need a 4 here."[7]  *Z3 Radio Comm. 2316 through 2330, 7:53.* Officer Rolfe is seen on his mic, also radioing

---

[7] A "4" is an ambulance.

for help.  *Bystander Video IMG_2207 00:22-00:27*. Radio traffic from a separate channel reflects that Rolfe within seconds yells "start a 4," one of seven times he demands an ambulance.  Rolfe also says "63" several times and requests other officers to assist. *Jun 12 2020 SOS radio 2324  - 2330 hrs incident 201641723*.

Officer Brosnan, who appears dazed from hitting his head when Brooks assaulted him, and himself needed medical attention, does not step on Brooks but assists in rendering aid.  *Bystander Video IMG_2207; Enhanced Wendy's Video*. Rolfe turned Brooks over and briefly straddled him to confirm he was no longer a threat, and then ran to his vehicle and retrieved his first aid kit.  After multiple calls for an ambulance, Rolfe, himself, began administering first aid within 132 *seconds* of Brooks falling.  *Bystander Video IMG_ 2207 00:42-01:50*.  Brosnan at times relieves Rolfe and likewise renders aid to Brooks. *Matthews BWC 23:32:14-:36; Bystander Video IMG_2208; Dey BWC 23:32:18-40*.

 The 132 seconds is calculated as follows:  On the Enhanced Wendy's Video, Brooks falls at 00:02.  Then 33 seconds later Officer Brosnan steps over Brooks to stand next to Officer Rolfe.  That same view is seen on Bystander Video IMG_2207 at 00:12. On IMG_2207, 31 seconds later at 00:43 Rolfe is seen running back to his car.  On IMG_2207 at 1:50 Defendant Officers are seen rendering aid.  Adding those times together from the time that Brooks falls to the ground until Officer Rolfe is rendering aid is 132 seconds.  In that short time, he is seen assessing the scene, calling for

assistance, <u>running</u> to his vehicle to get his first aid kit and then returning to render aid.[8] To the extent that Plaintiffs could even remotely characterize Rolfe's actions as "delay" - based on what is seen on the video, they cannot - this situation falls within that area that the Eleventh Circuit has left open wherein an elapse of seconds or even a few minutes before rendering aid is de minimis and cannot give rise to a deliberate indifference claim.  The Defendant Officers are both seen rendering aid for several minutes until the ambulance arrives. *Matthews BWC 23:29:21-:32:34; Bystander Video IMG _2207 0:01:48ff; Bystander Video IMG_2208.*

The videos are difficult to watch, but they clearly show the Defendant Officers responding to circumstances created by Brooks.  The Defendant Officers' response to these circumstances are reasonable as a matter of law, and certainly do not violate any clearly established law nor demonstrate any actual malice.

## III.   STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides the mechanism by which a defendant may seek dismissal of any claim which fails to state a basis upon which relief can be granted. A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Plaintiffs

---

[8] On Rolfe's Dash Cam shots are heard at 03:23:59. Then one hears and sees the vehicle opened (a bystander's voice gets louder) and closed (the camera vibrates) at 03:26:05. This is when Rolfe retrieves his personal first aid kit.  That was 2 minutes 6 seconds after the shots are fired and 2 minutes after Brooks falls.

need not plead "detailed factual allegations" fully outlining the merits of their case. <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964, 167 L. Ed.2d 929 (2007). But in order to survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed.2d 868 (2009) (internal citations omitted).

A complaint states a facially plausible claim "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id</u>. "This standard 'calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the claim*."* <u>Jackson v. JPay, Inc.</u>, 851 F. App'x 171, 172 (11th Cir. 2021) (quoting <u>Twombly</u>, 550 U.S. at 556). Importantly, where video evidence contradicts the plaintiff's pleaded factual allegations, the Court must view the facts "in the light depicted by the videotape." <u>Scott v. Harris</u>, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 1776, 167 L. Ed.2d 868 (2007).

## IV.    ARGUMENT AND CITATION OF AUTHORITY

### A.    Officer Rolfe Is Entitled to Judgment as A Matter of Law on Plaintiffs' Fourth Amendment Excessive Force Claim.

The United States Supreme Court has held that an excessive force claim against a law enforcement officer must be analyzed under the Fourth Amendment reasonableness standard. <u>Graham v. Connor</u>, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871, 104 L. Ed.2d

443 (1989). The reasonableness inquiry in a Fourth Amendment excessive force case is an objective one.   The question is whether the officer's actions were objectively reasonable in light of the facts confronting the officer, regardless of the officer's underlying intent or motivation. Id. at 397. The Court must consider such factors as the need for force, the relationship between the need and the amount of force used, and the extent of the injury inflicted. Graham, 490 U.S. at 396 (citations omitted). Furthermore, reasonableness must account for the fact that police officers are sometimes forced to make split-second judgments under circumstances that are tense and rapidly evolving. Graham, 490 U.S. at 397.

There is no bright-line standard regarding the use of force. Therefore, qualified immunity applies unless the circumstances would inevitably lead a reasonable officer in the defendant's position to conclude that the force used was unlawful. Gold v. City of Miami, 121 F.3d 1442 (11th Cir. 1997), cert. denied, 119 S. Ct. 165 (1998). Furthermore, the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, not by 20/20 hindsight. Rodriguez v. Farrell, 280 F.3d 1341 (11th Cir. 2002), cert. denied, 123 S. Ct. 1482 (2003); Plumhoff v. Rickard, 572 U.S. 765, 774-75, 134 S. Ct. 2012, 2020 188 L. Ed.2d 1056 (2014).

### 1.    Officer Rolfe's actions were reasonable as a matter of law.

"The Supreme Court has said that if the suspect threatens the officer with a weapon or there is probable cause to believe that [the suspect] has committed a crime

involving the infliction or threatened infliction of serious physical harm, then it is constitutionally permissible to use deadly force to prevent the escape of the suspect. . .. [T]he Constitution must also permit the use of deadly force against a suspect who poses not merely an escape risk (because he is not yet in police control), but also an imminent threat of danger to a police officer or others." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1246 (11th Cir. 2003) (citing Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed.2d 1 (1985) (internal quotations omitted)).

The Supreme Court in Garner held that deadly force is likely reasonable if the suspect poses an immediate threat of serious physical harm to officers or others; the suspect committed a crime involving the infliction or threatened infliction of serious harm, such that his being at large represents an inherent risk to the general public; and the officers either issued a warning or could not feasibly have done so before using deadly force. See 471 U.S. at 11–12, 105 S. Ct. at 1701. None of those factors, however, are prerequisites to the lawful application of deadly force by an officer seizing a suspect. Scott, 550 U.S. at 382, 127 S. Ct. at 1777.

"[W]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officers or others, use of deadly force does not violate the Constitution." Penley v. Eslinger, 605 F.3d 843, 851 (11th Cir. 2010) (citing Garner, 471 U.S. at 11). "It is axiomatic that when an officer is threatened with deadly force, he may respond with deadly force to protect himself." Hunter v. City of Leeds,

941 F.3d 1265, 1279 (11th Cir. 2019).  Generally, the evaluation of the use of force, "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, at 396, 109 S. Ct. at 1872.

Under the circumstances faced by Officer Rolfe, his use of deadly force against Brooks was reasonable as a matter of law.  While the initial crime being investigated was a DUI, at the time Officer Rolfe shot Brooks, Brooks had attacked the officers, stolen a weapon, used that weapon against Officer Brosnan, was attempting to flee with that weapon and had discharged the weapon at Officer Rolfe.  Brooks had committed felony obstruction of a police officer, O.C.G.A. § 16-10-24(b), assault, O.C.G.A. § 16-5-20, aggravated assault, O.C.G.A. § 16-5-21, battery, O.C.G.A. § 16-5-23.1, removal of a weapon from a peace officer, O.C.G.A. § 16-10-33, and perhaps other forcible felonies.  He had taken and used a police weapon. He was an immediate threat to Officer Rolfe and a possible threat to others.  Under the law of this State and the Eleventh Circuit, those are serious crimes that authorize the use of deadly force.  O.C.G.A. § 17-4-20(b) (deadly force authorized when suspect threatens serious injury or physical violence to the officer); see Palencia v. State, 359 Ga. App. 307, 855 S.E.2d 782, 788 (2021) (a Taser used offensively can cause serious injury); Eberhart v. State, 307 Ga. 254, 835 S.E.2d 192 (2019) (a Taser can be considered a deadly weapon for purposes of

the offense of aggravated assault).  At the instant Rolfe fired, Brooks while running to escape, had turned and pointed the weapon he was carrying at Rolfe and discharged it. In other words, the threat could not have been more immediate.

In the videos attached to Defendant Officers' motion, Brooks can be seen and heard, violently resisting arrest, and fighting with the officers.  Brooks is seen turning and pointing a weapon at Rolfe and is seen and heard discharging that weapon at Rolfe.[9] This case simply requires the straight forward application of the language of <u>Garner</u>, that if a suspect threatens an officer with a <u>weapon</u> and has committed a felony, the officer does not violate the Constitution if he uses deadly force to effect an arrest.  Likewise, if a violent arrestee seeks to escape, the officer does not violate the Constitution if he uses deadly force.  Therefore, under the language of <u>Garner</u>, Officer Rolfe's actions were reasonable as a matter of law.

### 2.    Officer Rolfe is entitled to qualified immunity.

Four years ago, in a case involving deadly force, the United States Supreme Court wrote:

> Qualified immunity attaches when an official's conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Mullenix v. Luna</u>, 577 U.S., at —  — – ——, 136 S. Ct., at 308. While this Court's case law "'do[es] not require a case directly on point'" for a right to be clearly established, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" <u>Id</u>., at ——, 136 S. Ct., at 308. In other words,

---

[9] It was the same weapon he stole from Officer Brosnan and used to attack him.

-14-

immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" <u>Ibid</u>.

In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases. See, *e.g.*, <u>City and County of San Francisco v. Sheehan</u>, 575 U.S. ——, ——, n. 3, 135 S. Ct. 1765, 1774, n. 3, 191 L.Ed.2d 856 (2015) (collecting cases). The Court has found this necessary both because qualified immunity is important to "'society as a whole,'" <u>ibid.</u>, and because as "'an immunity from suit,' " qualified immunity "'is effectively lost if a case is erroneously permitted to go to trial,'" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L.Ed.2d 565 (2009).

Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined "at a high level of generality." <u>Ashcroft v. al–Kidd</u>, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L.Ed.2d 1149 (2011). As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. <u>Anderson v. Creighton</u>, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." <u>Id</u>., at 639, 107 S. Ct. 3034.

<u>White v. Pauly</u>, 137 S. Ct. 548, 551–52, 196 L. Ed.2d 463 (2017); <u>see also</u>, <u>Kisela v. Hughes</u>, 138 S. Ct. 1148, 200 L. Ed.2d 449 (2018). These principals were underscored by the Supreme Court as recently as this October in a *per curiam* opinion reversing the Tenth Circuit, and holding that qualified immunity applied. That case involved a man threatening three officers with a hammer and an allegation that the officers contributed to the circumstances requiring deadly force. <u>City of Tahlequah, Oklahoma v. Bond</u>, 2021 WL 4822664, at *2 (U.S. Oct. 18, 2021) (*per curiam*).

In this case, Officer Rolfe was faced with a fleeing, felony suspect who violently resisted arrest. As Officer Rolfe chased him, the suspect turned, pointed a weapon at of

Officer Rolfe and discharged that weapon.  Furthermore, this was not an isolated scene, such as the side of a remote road, or an individual confined in a house.  Rather, the circumstances were developing in a crowded area, with multiple people of all ages in the immediate area.

The undersigned has not located any case from any circuit, much less the Eleventh Circuit Court of Appeals,[10] the United States Supreme Court or the Georgia Supreme Court, that clearly establishes that Officer Rolfe violated Brooks' constitutional rights against the use of deadly force when a violent fleeing suspect turns and discharges a weapon in his direction.  Based on Rolfe's dash cam, at 23:16, Rolfe initiated an arrest.  At 23:21 Brooks began to violently resist.  At 23:52 Brooks punched Rolfe in the face.  At 23:54 Brooks took Brosnan's Taser, pointed it at Brosnan's face, and fired the Taser

---

[10]    The case of Cantu v. City of Dothan, Alabama, 974 F.3d 1217 (11th Circuit 2020) cannot clearly establish the law applicable in this matter.  First, it was issued on September 30, 2020, two and a half months after the events of June 12, 2020.  Furthermore, the facts that the Eleventh Circuit held created a triable issue making summary judgment on qualified immunity inappropriate are quite different than those facing Officer Rolfe.  First, in Cantu the Taser was not "in prong which is the mode designed to incapacitate . . . and had been converted to drive stun mode, which is designed to inflict pain and generally does not incapacitate." Id. at 1231.  In this case, Brooks fired a Taser in probe mode at Officer Rolfe.  This can be seen and heard in the various videos.  Second, in Cantu, the plaintiff's decedent had not resisted violently and was not attempting to escape.  As noted above, the facts facing Officer Rolfe were much different.  Third, at the time Cantu's decedent was shot, he did not have control of the Taser and was being held by another law enforcement officer that outweighed him by 75 pounds.  Notably, the Eleventh Circuit in Cantu points to no cases with similar facts, much less a case in which a suspect actually gains control of a Taser in probe mode, flees and then turns to discharge the weapon at a police officer.

at Brosnan.  At 24:00 he discharged that weapon at Rolfe and Rolfe shoots.  There were 5 seconds between calm and combative and 40 seconds to the threat directed at Rolfe of severe bodily injury.

The same facts that made the use of deadly force reasonable, make qualified immunity appropriate.   No case establishes that the use of deadly force is unconstitutional in circumstances faced by Officer Rolfe:  a violently combative arrestee, who committed multiple forcible felonies against the officers, who stole <u>and used</u> a police weapon directed at the officers, who was attempting to escape, all of which occurred in an area with multiple civilians of all ages.  As noted in the footnote, the facts of <u>Cantu</u> where the Court of Appeals found obvious clarity are starkly different than those faced by Rolfe.

This case is a clear illustration of a tense situation that evolved very rapidly and resulted in the need for a law enforcement officer to make a split-second decision.  This case presents precisely the facts and circumstances to which qualified immunity is intended to apply.  The reasonable officer in Rolfe's position does not violate clearly established law when he uses deadly force in these circumstances.

## B. Defendant Officers Are Entitled to Summary Judgment on any Allegations Regarding Post Shooting Force.

In Count Two of Plaintiffs' First Amended Complaint, they allege that rather than rendering aid after Rolfe was forced to shoot Brooks, Rolfe kicked him and Brosnan put his foot on his shoulder.  The video does not show that Rolfe kicked Brooks, but rather

that he turned him over and stepped over him to straddle him.  It is unclear from the available video whether Brosnan's foot is on Brooks or not, but given the circumstances that the officers had just faced and the need to make sure that Brooks posed no further threat to themselves or others, briefly restraining him during that assessment is reasonable as a matter of law.  During the time in which these activities allegedly occur, Brooks was not handcuffed or otherwise restrained.  Therefore, this is not a circumstance in which officers use unnecessary force against an arrestee that was already handcuffed or otherwise restrained.

### 1. The Defendant Officers' actions were reasonable as a matter of law.

The only incidents on the video that could possibly be characterized as Rolfe kicking Brooks occurs in the Wendy's video when a car obstructs the view.[11]   Only the upper portion of Rolfe's body can be seen, and it is clear that he is doing something with his lower body.  However, when the car moves, it becomes clear that he has turned Brooks over and is straddling him, again, as part of a reasonable effort to make sure that Brooks presents no danger to the officers or others.  When one realizes that Rolfe is straddling Brooks who is on his side, and then reviews the motion of his body in the previously referenced video, it is clear that that motion results in him stepping over

---

[11] Former District Attorney Paul Howard is the only person who made the claim that Officer Rolfe kicked Brooks.  However, the video evidence does not support that claim, and the investigation by the GBI failed to find one eyewitness back up that claim.

Brooks rather than kicking Brooks.  *Enhanced Wendy's Video; Bystander Video IMG_2207.*  The videos do not show Rolfe kicking Brooks.

Likewise, even if Brosnan placed his foot briefly on Brooks' shoulder, that was reasonable as a matter of law under the circumstances.  Approximately 1 minute before this point in time Mr. Brooks had been standing talking with the officers.  In the intervening minute he had attacked Brosnan, stolen his Taser, discharged it at Brosnan and then discharged that weapon at Officer Rolfe.  In the immediate seconds after these events, it is entirely reasonable for an officer to place a foot on the upper extremity to prevent harm to the officer or others.  See, Kisela, *supra* (officer shot plaintiff, handcuffed plaintiff and then called the paramedics).

### 2.   The Defendant Officers are entitled to qualified immunity.

The standard for qualified immunity is set forth above.  Even if the Court cannot conclude from the video that the Defendant Officers' actions were reasonable as a matter of law, they are entitled to qualified immunity.  First, it should be noted, as explained in much more detail in the next section, within 132 seconds of Brooks being on the ground, Officer Rolfe was rendering aid to him.  Therefore, any allegation that the Defendant Officers were deliberately indifferent or intentionally failed to render aid is specious and contradicted by the video.  More to the point, Plaintiffs are not going to be able to find a case involving an arrestee who is not handcuffed or otherwise restrained, who just violently attacked the arresting officer, including discharging a weapon at them, where

some measure of force is held to be inappropriate or unlawful.  Even a violent strike such as a kick (which did not occur), much less mere pressure to prevent further violence, would not violate clearly established law given the facts and circumstances faced by Rolfe described above.  Both Defendant Officers are entitled to qualified immunity on Count Two of Plaintiffs' Complaint.

### C. The Defendant Officers Were Not Deliberatively Indifferent to Serious Medical Needs.

To establish a claim of deliberate indifference to Brooks' medical needs, Plaintiffs must prove (1) that Brooks suffered from an objectively serious medical need; (2) that the Defendant Officers had actual knowledge that Brooks' medical condition presented a substantial risk of serious harm; (3) that the Defendant Officers intentionally disregarded that risk; (4) that the Defendant Officers' conduct amounted to more than gross negligence; and (5) that the Defendant Officers' conduct caused Brook's death.  Adams v. Poag, 61 F.3d 1537, 1543-44 (11th Cir. 1995); Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306–07 (11th Cir. 2009).  The Defendant Officers are entitled to judgment as a matter of law.

For obvious reasons, on this Motion to Dismiss Defendants address only the third and fourth elements.  The video shows that neither of the Defendant Officers intentionally disregarded the need to render aid, and certainly their immediate actions did not constitute, much less exceed, gross negligence.  As set forth above, the Defendant Officers had just been in a ground fight with a violently combative arrestee, who had

stolen a weapon, attempted to escape, and had discharged the weapon at both officers. The time between when Brooks is shot and Rolfe commences to render aid is 132 seconds, a de minimis time under the circumstances.

The video clearly shows the Defendant Officers making sure the suspect is "secure" and by that, meaning that he no longer constitutes a potential threat to the Defendant Officers or others. On video, Rolfe can be heard after the shots saying "put your hands behind your back." See, Kisela, supra. (officer shot plaintiff, handcuffed plaintiff and then called the paramedics). As soon as it happened, Brosnan had immediately radioed "shots fired" and requested "a 4," or an ambulance. Rolfe also is quickly on the radio calling for both backup and an ambulance. See Beshers v. Harrison, 2005 WL 8156085, *8 (N. D. Ga. Nov. 17, 2005) (collecting cases holding that officers discharge constitutional duty to injured detainee by calling for medical assistance) (citing City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244-46 (1983) (city fulfills constitutional obligation by see that detainee is promptly taken to hospital for treatment)); Adams v. Custer, 2016 WL 155081, *16-*17 (S.D. Fla. Jan. 12, 2016) (same). Rolfe ran to his vehicle to retrieve personal first aid equipment, and returned to Brooks' side and commenced treatment. Rolfe's treatment consisted of packing Brooks' wounds with blood stop hemostatic gauze, and then commencing CPR.[12] Rolfe,

---

[12] We know from medical records that Brooks was bleeding internally and nothing the Officers could do for the external wound treatment or CPR could stop the bleeding.

himself, continues CPR almost until the ambulance arrived, at times relieved by Brosnan. *Matthews BWC 23:29:21-:32:34; Bystander Video IMG _2207 0:01:48ff; Bystander Video IMG_2208*. During that time, he can be seen talking to Brooks and trying various techniques to attempt to aid Brooks. The Defendant Officers' actions are the opposite of deliberate indifference.

Plaintiff must also establish that the Defendant Officers' conduct amounted to more than gross negligence. The video does not show any evidence that the Defendant Officers were not reacting as reasonably and as quickly as possible. Under the circumstances, after Rolfe lawfully used deadly force, there was nothing more the Defendant Officers could have possibly done.

### 1.  The Defendant Officers are entitled to qualified immunity.

The standard for qualified immunity set forth above applies to this claim. Given the circumstances in which Defendant Officers found themselves, they did not violate any clearly established law. Again, as noted above, Defendant Officers both initially called for an ambulance within seconds, and Rolfe was actually rendering aid within 132 seconds of Brooks falling to the ground. The Eleventh Circuit has left open the possibility that a short period of time, seconds or minutes, may constitute a de minimis delay that does not violate the Constitution. Notwithstanding, the timeframe between the injury and rendering aid that is clear from the video is far shorter than those that the Eleventh Circuit has held may constitute deliberate indifference. Brown v. Hughes, 894

F.2d 1533, 1538 (11th Cir. 1990) ("Even if we were to recognize as de minimus delays of a few seconds or minutes, a deliberate delay on the order of hours in providing care for a serious and painful broken foot is sufficient to state a constitutional claim."). The Defendant Officers were responding as quickly as they could under the circumstances in which they found themselves. Again, these are precisely the circumstances for which qualified immunity was intended to shield the officer from not only liability, but litigation.

### D. To the Extent Plaintiffs' Claims Sound in State Law, Including Battery, Defendant Officers are Entitled to Official Immunity.

Under Georgia law, public officials sued for the performance of their official duties are entitled to assert official immunity. See Ga. Const. Art. I, Sec. § 2, Para. 9(d); see also Bailey v. Wheeler, 843 F.3d 473, 485 (11th Cir. 2016). "Under this immunity, a state official may not be held liable for injuries caused through his performance of discretionary functions unless he acts 'with actual malice or with actual intent to cause injury.'" Graham v. Cobb County, 316 Ga. App. 738, 742, 730 S.E.2d 439, 443 (2012); Bailey, 843 F.3d at 485 (quoting Ga. Const. Art. I, § 2, Para. 9(d)). Plaintiff does not allege that Officers Rolfe or Brosnan violated a ministerial duty, nor could she. See Hart v. Logan, 664 Fed. Appx. 857, 863 (11th Cir. 2016) ("Under Georgia law, a law enforcement official's decision to use force while on duty falls squarely within his discretionary authority."); Daley v. Clark, 282 Ga. App. 235, 243-44, 638 S.E.2d 376, 383-84 (2006) (decision regarding rendering medical assistance falls within an officer's

discretionary duty); <u>Cantrell v. McClure</u>, 2018 WL 11170098, *5 (N.D. Ga., Mar. 12, 2018) (same). And thus, because the officers were performing discretionary functions, Plaintiff must demonstrate that they acted with actual malice. See <u>Bailey</u>, 843 F.3d at 485.

Public employees can only be held liable for discretionary acts performed with *actual* malice. <u>Golden v. Vickery</u>, 285 Ga. App. 216, 218, 645 S.E.2d 695, 696-97 (2007). Actual malice requires more than behavior demonstrating frustration, irritation, or anger. <u>Tittle v. Corso</u>, 256 Ga. App. 859, 862, 569 S.E.2d 873, 876-77 (2002) (internal citation omitted). "[E]vidence demonstrating frustration, irritation, and possibly even anger is not sufficient to penetrate official immunity, nor is proof of ill will, unless the ill will is combined with the intent to do something wrongful or illegal." <u>Selvy v. Morrison</u>, 292 Ga. App. 702, 706, 665 S.E.2d 401, 406 (2008).

As the Eleventh Circuit has explained, this is a high standard to overcome:

> In the context of Georgia's official immunity doctrine, actual malice requires a deliberate intention to do wrong. It does not include implied malice, i.e., the reckless disregard for the rights or safety of others. Instead, actual malice requires more than harboring bad feelings or ill will about another; rather, ill will must also be combined with the intent to do something wrongful or illegal. To overcome official immunity, a plaintiff's allegations must demonstrate that the defendant deliberately intended to cause the harm suffered by the plaintiff; it is not enough that the defendant merely intended to do the act purportedly resulting in the claimed injury.

<u>Bailey</u>, 843 F.3d at 485-86 (citations and quotations omitted).

Indeed, the Eleventh Circuit "has noted that Georgia's actual malice standard is higher than what is required to make out a Fourth Amendment violation." <u>Hart</u>, 664 Fed.

-24-

Appx. at 864. Here, Plaintiff cannot *possibly* demonstrate that either Defendant Officer *deliberately intended* to do any wrong.  From the time Brooks jumped up from the struggle with the officer's weapon to run until he pointed the weapon at Officer Rolfe was less than 10 seconds.  There is nothing in that timeframe or the split-second Officer Rolfe had to determine whether to use deadly force that can possibly be shown to be evidence of actual malice.

With regard to the deliberate indifference/failure to render aid claim, there is likewise nothing in the video suggesting actual malice.  Defendant Officers immediately radio that shots have been fired and call for an ambulance.

More importantly, after making sure the immediate scene is secure, Rolfe <u>ran</u> back to his car to get a personal first aid kit to begin to render aid.  Within 132 seconds of Mr. Brooks falling to the ground, Officer Rolfe is rendering aid and he and Brosnan <u>continue to do so</u> almost until the ambulance arrives moments later.  There is nothing in the videos that suggests that either Defendant Officer showed actual malice toward Mr. Brooks.  In fact, there is not one second in the videos that support any assertion of actual malice.  Thus, Plaintiff cannot prove any set of facts that would overcome Defendant Officers' official immunity, and any state law claims must fail.

(Continued on following page)

Respectfully submitted, this 29th day of November, 2021.

CAROTHERS & MITCHELL, LLC

/s/ Thomas M. Mitchell

_____

THOMAS M. MITCHELL
Georgia Bar No. 513597
Attorneys for Defendants Garrett Rolfe
and Devin Brosnan

1809 Buford Highway
Buford, GA 30518
T: (770) 932-3552
F: (770) 932-6348 Fax
Email:  thomas.mitchell@carmitch.com

IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| TOMIKA MILLER and the ESTATE OF RAYSHARD BROOKS, by and through Tomika Miller, Administrator, | : : : : | CIVIL ACTION |
| Plaintiffs, | : : | FILE NO. 1:21-CV-03752-SDG |
| v. | : : | |
| THE CITY OF ATLANTA, GEORGIA; GARRETT ROLFE, in his individual capacity; DEVIN BROSNAN, in his individual capacity, | : : : : : : | |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically submitted the foregoing **DEFENDANTS GARRETT ROLFE AND DEVIN BROSNAN'S BRIEF IN SUPPORT OF MOTION TO DISMISS** to the Clerk of Court using the CM/ECF system which will automatically send electronic mail notification of such filing to counsel of record who are CM/ECF participants.  Counsel of record are:

L. Chris Stewart, Esq.
Dianna J. Lee, Esq.
Stewart Miller Simmons Trial Attorneys
55 Ivan Allen Jr. Blvd., Suite 700
Atlanta, GA 30308
cstewart@smstrial.com
dlee@smstrial.com

G. Brian Spears, Esq.
Jeff Filipovits, Esq.
Spears & Filipovits, LLC
1126 Ponce de Leon Avenue
Atlanta, GA 30306
bspears@civil-rights.law
jeff@civil-rights.law

I further certify pursuant to L.R. 7.1D that the above-titled document complies with L.R. 5.1B and was prepared using a 14-point Times New Roman font.

This 29th day of November, 2021.

CAROTHERS & MITCHELL, LLC

/s/ Thomas M. Mitchell
_____
THOMAS M. MITCHELL
Georgia Bar No. 513597
Attorneys for Defendants Garrett Rolfe
and Devin Brosnan

1809 Buford Highway
Buford, GA  30518
T: (770) 932-3552